Leland R. CHALMERS,
Plaintiff–Appellant,

v.

QUAKER OATS COMPANY, Quaker Officers' Severance Program, Douglas Ralston, et al., Defendants–Appellees.

No. 94–2792.

United States Court of Appeals,
Seventh Circuit.

Argued April 6, 1995.

Decided Aug. 15, 1995.

Rehearing Denied Sept. 12, 1995.

Leon E. Lindenbaum (argued), Lindenbaum, Coffman, Kurlander, Brisky & Hayes, Chicago, IL, for Leland R. Chalmers.

Michael J. Sheehan, P. Kevin Connelly (argued), Martin Harris, Connelly, Sheehan & Moran, Chicago, IL, for Quaker Oats Co., Quaker Officers' Severance Program, Robert E. Montgomery.

Michael J. Sheehan, Connelly, Sheehan & Moran, Chicago, IL, for Robert Penzkover.

Before BAUER, COFFEY, and FLAUM, Circuit Judges.

BAUER, Circuit Judge.

Leland Chalmers, a former Vice President in Quaker Oats' ("Quaker") Tax Department, filed an action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., challenging the Quaker Oats Officers' Severance Program Committee's ("Committee") decision denying him severance benefits after he was discharged for violating Quaker's policy against sexual harassment. The Committee concluded that Chalmers was not entitled to severance benefits because sexual harassment constituted gross misconduct which thereby disqualified him from benefits under the terms of the plan. The district court affirmed the Committee's decision, and Chalmers appeals.

Although Chalmers was fired for conduct occurring in 1992, for a true understanding of the circumstances surrounding this action, we go back to 1988. In February of that year, Karen Brady, at the time a subordinate of Chalmers's, made a formal complaint to Douglas Ralston, Quaker's Senior Vice President for Corporate Human Resources. Brady's complaint alleged that Chalmers had violated Quaker's sexual harassment policy by making several inappropriate sexual comments to her. For example, while standing together in line at a restaurant salad bar, Chalmers allegedly remarked, "nice melons!" When asked about this during Ralston's subsequent investigation, Chalmers admitted making the intended double-entendre but characterized it as simple "boy talk." According to Brady's complaint, in stressing the importance of confidentiality, Chalmers apparently felt compelled to warn Brady not to scream out information about Quaker's business "while in the throes of passion and ecstasy" with her husband. These and other remarks bothered Brady, but when she complained privately to Chalmers, he told her to "lighten up on [her] feminist attitudes."

Acting on Brady's complaint, Ralston conducted a general investigation into the veracity of the allegations. He discovered that Brady was not the only woman who had encountered inappropriate behavior on Chalmers's part. One employee reported that after giving a presentation and asking for comments or questions, Chalmers obliged by telling her that she had "a nice backside." Ralston's investigation also revealed that Chalmers behaved inappropriately at company social events. For instance, at a Quaker party on board a boat on Lake Michigan, Chalmers asked one of the Tax Department secretaries to dance. When she refused, Chalmers picked her up and carried her onto the dance floor. At another function, Chalmers approached an employee named George Pappas and his date, and charmingly asked Pappas's date if she enjoyed "dating fat boys." When no reply was forthcoming from the woman, Chalmers asked Pappas whether he enjoyed "dating fat girls who put out."

Other employees in the department told Ralston that they were reluctant to report incidents of perceived sexual harassment because there was a general fear that Chalmers would retaliate. Awareness of Chalmers's attitude towards sexual harassment made it difficult for Ralston to uncover support for Brady's allegations unless Ralston promised to keep the identities of several witnesses confidential. One employee, Steve Orzechowski, reported that Chalmers had reprimanded him for corroborating a coworker's allegations of sexual harassment against an-

other employee, Steve Vranek. Vranek was eventually fired for violating the sexual harassment policy.

Ralston's investigation led him to believe that Quaker should discipline Chalmers. As a result of the Brady incident, Chalmers's compensation was reduced and he was required to attend seminars on sexual harassment awareness. He was also warned that any repeat occurrences could result in his termination.

On August 20, 1992, Anna Raisor, an executive assistant for Terry Westbrook, Chalmers's immediate superior, asked Chalmers to sign something for Westbrook. At the time, Raisor was temporarily assigned to work for Chalmers because Chalmers's regular secretary was on vacation. Chalmers reacted angrily, yelling and criticizing Raisor for work she had done earlier on an unrelated matter. Later that afternoon, Raisor returned to Chalmers's office to drop off some documents. When she arrived, Chalmers directed her to step behind an office divider, out of view from the hallway by his office. Chalmers then kissed Raisor on the cheek.

Characterizing this act as "inappropriate, shocking and repulsive," Raisor formally complained to Ralston. Once again, Ralston initiated an investigation into Chalmers's conduct. In an interview with Ralston, Chalmers defended his action as a gesture of apology for his earlier outburst. He equated the kiss to a handshake and attributed his behavior to his "Mediterranean blood." Ralston discussed the situation with Robert Montgomery, Vice President of Human Resources for Quaker's U.S. Grocery Products Division. Montgomery's duties in his division were similar to Ralston's duties in the Corporate Division, and Ralston wanted to ensure that Quaker's policies with respect to sexual harassment and severance were interpreted consistently.

In early September 1992, Ralston and Westbrook decided that Chalmers should be fired. They concluded that the incident with Raisor violated Quaker's sexual harassment policy because it was an uninvited and offensive act of sexual conduct. Though the kiss was sufficient, when combined with earlier findings that Chalmers contributed to an of-

fensive and intimidating environment and the warning issued to him thereafter, Ralston believed that termination was more than justified. Ralston also determined that because Chalmers was being discharged for "gross misconduct," he was not entitled to receive benefits under Quaker's severance program.

Ralston informed Chalmers of his decision verbally on September 11 and in a letter dated September 25. On November 6, 1992, Chalmers appealed the denial of severance benefits to the Committee. Ralston, who typically served on the Committee with Montgomery, recused himself from the appeal because of his role in the investigation and decisionmaking process. Robert Penzkover, Quaker's Director of Employee Benefits, took Ralston's place. The Committee affirmed Ralston's decision on December 2, 1992.

Chalmers appealed the Committee's decision to the district court. Quaker's severance program is a health and welfare fund as defined by ERISA, and therefore the court had jurisdiction. Reviewing the Committee's decision under the arbitrary and capricious standard, the district court could not find reversible error, and it affirmed the denial of severance benefits. 859 F.Supp. 1149 (N.D.Ill.1994). Claiming that the Committee's decision deprived him of approximately $240,000 in benefits, Chalmers now appeals to us.

 The first matter which we must resolve is the scope of review. Keep in mind that this is not a Title VII case; it is an ERISA case, and this frames the manner of our review. In *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court decided that the practice of reviewing decisions by ERISA fiduciaries according to standards developed in the context of the similar Labor–Management Relations Act was inappropriate. *Id.* at 110, 109 S.Ct. at 954. A far superior model could be found in the law of trusts. Consequently, the court announced that the arbitrary and capricious standard of review was to be replaced by *de novo* review unless the terms of the agreement granted the fiduciary discretion in the award or deni-

al of benefits. *Id.* at 115, 109 S.Ct. at 956–57. When the fiduciary has discretion, we review its decisions for abuse. *Exbom v. Central States Health & Welfare Fund*, 900 F.2d 1138, 1142 (7th Cir.1990). As in trusts law, whether something constitutes an abuse depends on the terms of the instrument; the more discretion that is conferred upon the trustee or fiduciary, the more deference the consequent decision is entitled. *Id.* When, as is the case here, the amount of discretion is virtually unconstrained, the court should review the decision under an arbitrary and capricious standard. *Id.* Under that standard we evaluate several factors: the impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination. *Id.* Chalmers contests the first and last of these factors.

Chalmers first contends that any deference to which the Committee is entitled should be limited because its members operated under a significant conflict of interest. Specifically, he enumerates three separate forces which he claims made the Committee's decision against him inevitable. First, he argues that by allowing officers of Quaker to serve on the Committee, the decision is inherently impartial. Second, he claims that because Quaker's severance program was an unfunded plan, i.e., not funded by salary withholdings, the Committee had an automatic bias against dispensing severance benefits since those came directly from Quaker's earnings. Third and lastly, Chalmers contends that Montgomery's and Penzkover's relationship to Ralston rendered their decision biased.

■ Chalmers's first cited instance of bias is undermined by a provision in ERISA which provides specifically that employers may appoint their own officers to administer ERISA plans even if the company is a "party in interest." 29 U.S.C. § 1108(c)(3). Plainly and not surprisingly, ERISA contemplates less neutrality than is required in a judicial forum.

■ The ERISA-endorsed notion of a corporate officer who doubles as a plan administrator serves also to defeat Chalmers's second alleged instance of bias: Quaker's financial interests. Were this cause for concern, ERISA would take measures to prohibit corporate officers from serving as plan administrators. That ERISA does not take such measures is defensible. The impact on a company's welfare of granting or denying benefits under a plan will not be sufficiently significant as to threaten the administrators' partiality. *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1051 (7th Cir.1987). Quaker provides a good example. It is a corporation which generates revenues of nearly $6 billion annually and is therefore not likely to flinch at paying out $240,000. Not only does the amount pale in comparison to revenues, but it is also a poor business decision to make it a practice of resisting claims for benefits. In the long run, such a practice would dampen loyalties of current employees while hindering attempts to attract new talent. *Id.* Quaker's understanding of these realities is borne out by the district court's finding that Quaker had no pattern of refusing to pay severance benefits.

■ Chalmers's final claim of bias asserts that Montgomery's and Penzkover's respective relationships with Ralston was such that each would be averse to overturning Ralston's decision to deny Chalmers benefits. The record belies this claim. Although Ralston was senior to Montgomery, they were in reality equals, each holding similar positions in parallel divisions. There is no evidence to show that Ralston exercised authority or control over Montgomery. Nor do Montgomery's conversations with Ralston during the investigation suggest any prejudgment. Ralston consulted with Montgomery to confirm his own understanding about Quaker's sexual harassment policy and its severance program. Chalmers fails to offer support for his theory that Montgomery had already decided the case before the Committee considered the appeal.

■ Evidence of any bias on Penzkover's part is similarly lacking. Though true that Ralston appointed Penzkover as his replacement on the Committee and that Penzkover was an immediate subordinate to Ralston,

there is no indication that there was anything more than the potential for conflict. Potential conflict is not enough. ERISA goes so far as to permit members of an appeals committee to perform the initial investigation without recusing themselves from the subsequent appeal. *See Fought v. Evans Prods. Co. Racine Pension Plan,* 966 F.2d 304, 305–06 (7th Cir.1992). In other words, Ralston did not have to recuse himself from the appeal if he did not want to. If anything, the fact that he did communicated to Penzkover a heightened concern for neutrality.

■ Our determination that the Committee was free of bias does not, however, lead to a speedy affirmance of its findings. If " 'it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome,' " *Exbom,* 900 F.2d at 1142 (quoting *Pokratz v. Jones Dairy Farm,* 771 F.2d 206, 209 (7th Cir.1985)), we will not disturb the decision. Not unexpectedly, Chalmers contends that no such explanation exists. He does not contend that a violation of Quaker's sexual harassment policy cannot constitute gross misconduct. Rather, he claims that Quaker's policy against sexual harassment is consonant with the protection provided by federal law and no more. Because he believes his actions did not amount to a violation of the standards embedded in federal law, he reasons that he did not violate Quaker's policy and concludes that his discharge for gross misconduct was therefore erroneous. We proceed then to determine the nature of Quaker's policy, and how it compares to federal law.

Quaker's published documentation on sexual harassment consistently defines sexual harassment as:

> unwelcome sexual advances; requests for sexual favors; and other verbal or physical conduct of a sexual nature when such conduct is made explicitly or implicitly a term or condition of employment, is used as a basis for employment decisions, or has the purpose or effect of interfering with work performance or creating an otherwise offensive working environment. . . .

> [I]n addition to physical or other explicit sexual conduct or language, our policy cov-

ers jokes of a sexual nature, "pin-ups", sexual stories, etc.

In Chalmers's case, these written communiques admittedly were supplemented by what he learned of Quaker's policy as a result of the investigation of his conduct in 1988, the reprimand and warning he was given, and his subsequent attendance at Quaker training sessions. Our task is to determine whether the written language, combined with these supplemental communications, provide a possible basis for the Committee's conclusion that Chalmers committed gross misconduct.

■ Chalmers contends that the parameters of Quaker's policy are equivalent to those of federal law pertaining to a hostile work environment. To succeed on a federal claim, a plaintiff must show the harassment to be "sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (citations omitted). Applying this standard to the facts in *Weiss v. Coca–Cola Bottling Co. of Chicago,* 990 F.2d 333, 337 (7th Cir.1993), we held that a defendant who had: asked the plaintiff for dates on repeated occasions, placed signs which read "I love you" in her work area, and attempted twice to kiss her, was not liable for sexual harassment because the incidents were too isolated and insufficiently severe.

More recently in *Saxton v. American Tel. & Tel. Co.,* 10 F.3d 526 (7th Cir.1993), we handled a similar case. There, the defendant had on one occasion put his hand on the plaintiff's leg and later kissed her until she pushed him away. A few weeks later, while the plaintiff was walking outside, the defendant jumped out at her from behind some bushes and unsuccessfully tried to grab her. We concluded that these incidents were insufficient to create a hostile work environment.

■ Common to both *Saxton* and *Weiss* is an emphasis on the frequency of the offensive behavior. Though sporadic behavior, if sufficiently abusive, may support a Title VII claim, success often requires repetitive misconduct. We agree with Chalmers insofar as he believes his conduct did not

violate federal law; the severity of his conduct in 1992 is not dissimilar to that at issue in *Weiss* and *Saxton*, and it was too remote in time from the earlier events to be considered pervasive. But is that dispositive? As Chalmers acknowledges, Quaker is certainly free to take a more stringent stance against sexual harassment, and they apparently have done so. The question is whether Chalmers was sufficiently apprised of Quaker's decision to take such a stance. For if the policy of which he was on notice was equivalent to federal law, the Committee's deviant construction would make the decision in his case arbitrary.

Chalmers makes much of the fact that one of Quaker's policy statements described the language excerpted above as a definition, "which reflects law and Quaker's policy." He claims that this is conclusive proof that Quaker's policy was intended to be equivalent to federal law. But this contention overstates the importance of this reference to the "law." A more reasonable reading of the single reference to the "law" is that it was intended to remind employees that sexual harassment is more than just a violation of company policy, it also has legal implications.

We believe that the issue of notice turns on how the written policy was supplemented. In Chalmers's case, there were other sources upon which he could have relied for notice. First, Chalmers's previous encounter with the sexual harassment policy should have alerted him to the policy's parameters. Quaker's decision to discipline him for the incident with Karen Brady was made without regard for whether his actions were contrary to federal law. Additionally and not insignificantly, Chalmers's supervisor at the time, Mike Callahan, warned Chalmers that one repeat offense could result in his termination.

Moreover, Quaker's stringent interpretation should have been evident to those like Chalmers who attended the sexual harassment awareness seminars. Joan Green, Quaker's Director of Affirmative Action testified that during Quaker's training sessions, employees were instructed that conduct which could be interpreted by the target as sexual may violate Quaker's policy. Green emphasized that in the training sessions, "unnecessary physical conduct" was given as an example of sexual harassment and that employees were not told that the policy could be violated only by repeated conduct.

In sum, the written policy, as supplemented by Quaker's training sessions and the warning given to Chalmers after his previous brush with the policy, provided him with sufficient knowledge from which he could have envisioned that a single offense would violate the policy. The fact that Chalmers construes it differently does not render the Committee's decision arbitrary and capricious.

As a final note, we add that the Committee's decision in Chalmers's case was perfectly consistent with its prior interpretations. Montgomery testified that a Quaker employee had been disciplined for telling a female coworker that he would like to see her breasts. Discipline was imposed even though the employee never actually initiated contact and had no history of sexual harassment. Another worker was disciplined for insinuating that a female worker had been earning money through prostitution. Again, there had been no prior incidents involving this worker. Montgomery's testimony demonstrates that the Committee did not adhere to the standard set by federal law in adjudicating sexual harassment complaints. Though these cases were treated in a confidential manner, and therefore are not relevant to notice, the consistency with which the policy is interpreted is surely significant in reviewing whether the Committee's decision was otherwise arbitrary or capricious.

That Quaker interpreted its policy in a manner more stringent than Title VII makes sense in light of its purpose: to address incidents of sexual harassment before they evolve into more severe situations. If Quaker's policy were consonant with federal law, Quaker would be hamstrung in its efforts to take measures to stop such conduct before it became so abusive and offensive that the company was vulnerable to a Title VII lawsuit.

We believe that the decision of the Committee to deny Chalmers severance benefits

was neither the product of bias nor unsupported by the evidence before it. As supplemented, the written language of the policy as well as the Committee's prior construction of it support the determination that its policy represented a more stringent stance against sexual harassment than federal law. For the foregoing, the opinion of the district court is

AFFIRMED.