Luther C. REAGAN, Plaintiff,

v.

**FIRST UNUM LIFE INSURANCE COMPANY, Defendant.**

No. 97–3406.

United States District Court, C.D. Illinois, Springfield Division.

March 18, 1999.

Donald R. Schuering, Quincy, IL, for plaintiff.

Mary Patricia Benz, Catherine J. Casey, Michael Steigmann, Chicago, IL, for defendant.

## OPINION

RICHARD MILLS, District Judge.

The ERISA plan administrator's decision to discontinue Reagan's monthly long term disability payments was neither arbitrary nor capricious.

Therefore, the Court must affirm his decision.

### I. BACKGROUND[1]

Luther C. Reagan began working for Foreign Credit Insurance Association ("FCIA") as a senior marketing representative in 1987. As part of its employee benefits package, FCIA provided its employees with a group long term disability plan.[2] FCIA's group long term disability plan was underwritten and provided by First UNUM Life Insurance Company ("UNUM"). This group long term disability plan provided in relevant part:

> "Disability" and "disabled" mean that because of injury or sickness:
>
> 1. the insured cannot perform each of the material duties of his regular occupation; and
>
> 2. After benefits have been paid for 24 months, the insured cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education, or experience; . . . .

The group disability plan provided long term disability benefits for eligible employees who met the plan's requirements:

> When the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician, the Company will pay the insured a monthly benefit after the end of the elimination period. The benefit will be paid for the period of disability if the insured gives to the company proof of continued:

---

1. The Court's factual findings are based upon UNUM's statement of undisputed facts which has been admitted by Reagan *in toto.*

2. This insurance policy was an employee welfare benefit plan within the meaning of the Employee Retirement Income Security Act ("ERISA"). 29 U.S.C. § 1001 *et seq.*

1. disability; and
2. regular attendance of a physician.

The proof must be given upon request and at the insured's expense.

On November 2, 1987, Reagan completed a disability benefits application in which he stated that he was a marketing representative, disabled due to a heart condition. On November 5, 1987, Dr. Karl Laping filled out a doctor's statement in support of Reagan's application for disability benefits.[3] Therein, Dr. Laping diagnosed Reagan as suffering from angina pectoris, cardiac arrhythmia, chest wall pain, anxiety attacks, depression, and shortness of breath. Dr. Laping indicated that Reagan was incapable of performing any work but that he expected a fundamental change in Reagan's condition in the future. In addition, Dr. Laping noted that Reagan's current occupation could be modified to allow him to perform his work with his impairments. Finally, Dr. Laping recommended that Reagan undergo vocational counseling and/or retraining. Based upon his application and Dr. Laping's statement, UNUM began making monthly long term disability payments to Reagan.

On July 29, 1988, Dr. Laping completed another statement regarding Reagan's medical condition. In this statement, Dr. Laping indicated that Reagan's medical condition had improved, noting a slight limitation in cardiac function and no mental impairments. Dr. Laping asserted that Reagan was not totally disabled from either his own occupation or from any other work.

Nevertheless, on August 22, 1988, Reagan completed a supplemental application for long term disability benefits. In this supplemental application, Reagan asserted that he was still totally disabled due to his chest pain and asserted that he was still unable to work. He also indicated that he had filed for Social Security benefits in May 1988. However, on September 27, 1988, the Social Security Administration notified Reagan that his benefit's claim had been denied because it "determined that [his] condition does not keep [him] from working."

On January 24, 1996, Dr. Laping completed a physical capacities evaluation form for Reagan in which Dr. Laping indicated that Reagan could work from six to eight hours per day. On February 21, 1996, Dr. Laping completed a physician's statement for Reagan. Therein, Dr. Laping stated that Reagan suffered from unstable angina pectoris but that there were no secondary conditions contributing to the disability. Dr. Laping wrote that Reagan had a slight limitation in his functional capacity with a Class 2 cardiac limitation under which a patient is comfortable in the performance of ordinary, light, daily activities. Dr. Laping also noted that Reagan's only restriction was that he should not do heavy lifting greater than 25 pounds but that there were no limitations on what he could do regarding his ability to work.

On July 23, 1996, UNUM's in-house cardiologist, Dr. Karen Kurkjian, reviewed Reagan's medical file. Dr. Kurkjian asserted that the medical tests revealed that Reagan's arteries, hemodynamics, and EF were normal and that there was no evidence of spasm. Based upon Reagan's medical file, Dr. Kurkjian concluded that "there is no evidence of any cardiac disease at all from the medical submitted and no reason for any R and L's [Restrictions and Limitations] and this appears to be supported by [Dr.] Laping."

On July 24, 1996, UNUM requested additional information from Dr. Laping regarding Reagan's medical condition. Specifically, UNUM asked Dr. Laping whether he disagreed with any of Dr. Kurkjian's conclusions and asked him to provide his own current diagnosis of Reagan, how he arrived at that diagnosis, whether Reagan had any current restrictions and limitations, and how those limitations and restrictions, if any, prevented

---

3. Dr. Laping is a general practitioner and is Reagan's personal physician.

him from working on a full-time basis. On August 1, 1996, Dr. Laping responded to UNUM's request. Therein, Dr. Laping did not disagree with Dr. Kurkjian's conclusions, nor did he list any restrictions or limitations on Reagan's ability to work. In fact, Dr. Laping asserted that "He [Reagan] stated that he works a half day or a whole day depending on how engaging his job is for the day." Based upon Dr. Laping's response and her own review of Reagan's medical file, Dr. Kurkjian concluded on August 28, 1996, that the "[e]vidence does not support lack of FT [full-time] work capacity."

On September 5, 1996, Reagan completed a written statement for UNUM. In his statement, Reagan asserted that he was buying out his partner in their corporation, LDS. Reagan claimed that he spent an average of three to eight hours per day and five days per week working at the office. In addition, Reagan indicated that it was his intention to build LDS's business and income after completing the buy out. Reagan wrote that he earned a total monthly income of $350.00 from LDS. He also indicated that he could walk at a slow pace for a couple of blocks before he gets chest pain; then, he must stop and rest. If his pain is not relieved by rest, he uses a transderm-nitro patch. Finally, Reagan asserted that he used an exercise bike at the office and that his use varied from a couple times a day to weekly.

On October 11, 1996, UNUM informed Reagan that it would be unable to extend further benefits to him based upon the lack of medical evidence supporting his disability.[4] On March 19, 1997, rehabilitation consultant Roberta Violetta conducted a vocational assessment of Reagan. Ms. Violetta concluded that Reagan's more re-

cent work experiences, which included several positions requiring only sedentary to light exertion, existed in the general economy and were appropriate for him in terms of his training, education, and experience as well as his particular medical restrictions and limitation.[5]

On March 28, 1997, UNUM informed Reagan's attorney that after reviewing the denial of Reagan's claim, its position regarding the discontinuation of Reagan's benefits remained unchanged. That same day, UNUM asked Dr. Kurkjian to review Reagan's most recent medical documentation. On June 2, 1997, Dr. Kurkjian opined that

> there is a marked lack of any objective evidence supporting impairment from any of the above; specifically, there are no PFT's on file, no holter monitors demonstrating significant dysrhythmia, no evidence of HTN [hypertension] of DM [diabetes mellitus] with severe lack of control to provide impairment, no stress testing demonstrating reduced functional capacity and/or ischemia, and no CAD [coronary artery disease] documented via cardia cath. R & L's are not supported ie no objective evidence, only subjective complaints with prior negative testing.

On July 23, 1997, UNUM's quality review upheld the denial of Reagan's claim.

On November 25, 1997, Dr. Irving Schwartz, a cardiologist, assessed Reagan's medical condition and found "[c]hronic chest pain, anginal in nature without objective evidence at the present time."[6] On April 20, 1998, Dr. Schwartz wrote a progress report on Reagan's medical condition opining that the "[p]atient in the past not representative of ischemic heart disease, though increasingly his risks

---

4. Until this time, UNUM had been making monthly long term disability benefits to Reagan.

5. Reagan's more recent work experiences included telephone solicitor, sales clerk, insurance agent, credit and collection manager, and telephone service sales representative.

6. Dr. Laping referred Reagan to Dr. Schwartz "[b]ecause [he] couldn't evaluate [Reagan] to the fullest to make sure that objective findings are either presented or proved or disproved."

at this time are substantial." On October 31, 1997, Dr. Schwartz performed a stress echo test on Reagan and concluded: "1) Equivocal dobutamine EKG.... 2) Positive for patient's atypical angina type pain. 3) Good left ventricular function without evidence of induceable ischemia by echocardiograph criteria." On April 21, 1998, Dr. Schwartz wrote:

> To whom it may concern: Mr. Reagan has been suffering from chronic chest pain with features typical of coronary ischemia for many years. However, inability to demonstrate active coronary artery disease is a drawback here. Nevertheless, patient finds it quite debilitating and has been unable to perform many tasks, particularly stressful situations. At present his risks for cardiovascular disease have increased significantly and he continues to follow with me for this reason.

Because UNUM discontinued paying him disability benefits, Reagan filed a Complaint seeking back pay and reinstatement of his monthly disability payments. Reagan alleged that UNUM wrongfully terminated his long term disability benefits as of October 11, 1996, after it had paid him more than two years of benefit payments.

## II. STANDARD OF REVIEW

Before turning to the merits of UNUM's motion, the Court must resolve two issues. First, the Court must determine the proper standard of review to be applied in reviewing the plan administrator's decision to discontinue Reagan's monthly benefits. Second, the Court must decide the proper scope of the Court's review. Specifically, the Court must determine whether its review is limited to the administrative record before the plan administrator when he made his decision to discontinue Reagan's benefits, or whether the Court may consider medical evidence accumulated after the plan administrator had made his decision. Once the Court has decided these two issues, UNUM's motion is easily resolved.

The United States Supreme Court has held "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989); *see also Ramsey v. Hercules, Inc.,* 77 F.3d 199, 202 (7th Cir.1996). The long term disability plan at issue provided that UNUM would pay a monthly benefit "[w]hen the Company receives proof that an insured is disabled due to sickness or injury and requires the regular attendance of a physician...." The United States Court of Appeals for the Seventh Circuit has opined that arbitrary and capricious is the proper standard of review to be applied in cases involving language similar to that found in the instant plan. *E.g. Patterson v. Caterpillar, Inc.,* 70 F.3d 503, 505 (7th Cir.1995); *Donato v. Metro. Life Ins. Co.,* 19 F.3d 375, 379 (7th Cir.1994); *Bali v. Blue Cross and Blue Shield Ass'n,* 873 F.2d 1043, 1047 (7th Cir.1989).

In fact, the United States District Court for the Northern District of Illinois has found, after examining in other cases the exact language found in this insurance policy, that arbitrary and capricious is the proper standard of review to be applied to the plan administrator's decision to deny benefits. *See Infantino v. Waste Management, Inc.,* 980 F.Supp. 262, 266 (N.D.Ill. 1997); *see also Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan,* 979 F.Supp. 726, 729 (N.D.Ill. 1997). In the face of this overwhelming authority, Reagan "reluctantly agrees" that the applicable standard of review in the case *sub judice* is arbitrary and capricious. Therefore, arbitrary and capricious is the standard of review which the Court will apply.

As for the scope of review, that issue goes hand-in-hand with the previous

one. *Bollenbacher v. Helena Chem. Co.,* 926 F.Supp. 781, 788 (N.D.Ind.1996). The Court believes that it has the authority to consider evidence not presented to the plan administrator only if it is applying a *de novo* standard of review, and even then, it should do so sparingly. *See Casey v. Uddeholm Corp.,* 32 F.3d 1094, 1099 n. 4 (7th Cir.1994) (citing cases) (holding that although the court has the authority to review facts not before the plan administrator, the court should use that authority sparingly); *see also Ramsey,* 77 F.3d at 204 (holding that "[t]he key question is whether the administrator has discretion under the plan."). Because the Court will apply a deferential standard of review in examining the plan administrator's decision, the Court will limit its review to the record which was before the plan administrator at the time when he decided to discontinue Reagan's monthly benefits, i.e., October 11, 1996. Having resolved these two issues, the Court turns to the substance of UNUM's motion.

## III.  ANALYSIS

Reagan argues that UNUM's motion should be denied because there are genuine issues of material fact which prevent the Court from entering summary judgment against him. Specifically, Reagan asserts that his medical condition did not improve from the time he first filed an application for long term disability benefits until the time when his benefits were terminated. In fact, Reagan claims that his medical condition has steadily declined over the past few years. Thus, Reagan argues that because he was disabled when he first filed his claim, and because his medical condition has not improved, he must still be considered to be disabled today.

Reagan also asserts that the plan administrator relied heavily upon the opinion of Dr. Kurkjian in deciding to terminate his benefits. However, Reagan claims that the Court should give Dr. Kurkjian's opinion little, if any, weight because, as an in-house cardiologist for UNUM, she is partial and is, at least to some degree, biased toward UNUM. Finally, Reagan argues that the fact that UNUM attempted to "buy him out" by offering him a lump sum monetary settlement establishes that it knows that he is still disabled as defined under the insurance policy and is entitled to monthly disability benefit payments.

UNUM argues that the medical evidence which its plan administrator had before it clearly shows that Reagan was not "disabled" as that term is defined under the insurance policy. Thus, the Court cannot say that its decision to terminate Reagan's benefits was arbitrary or capricious. Moreover, UNUM asserts that Dr. Kurkjian based her opinion regarding Reagan's medical condition on his medical file, not on any bias or prejudice toward it. Finally, UNUM claims that the fact that it may have offered Reagan a lump sum settlement is irrelevant.

Reagan's last two arguments deserve little attention. Although the partiality of a plan administrator and of a physician upon whose opinion a plan administrator relied is a factor which the Court may consider, *Chalmers v. Quaker Oats Co.,* 61 F.3d 1340, 1344 (7th Cir.1995), the Court finds no evidence that Dr. Kurkjian's opinion was swayed by any bias or prejudice toward UNUM. In fact, although given the opportunity to do so, Dr. Laping (Reagan's personal physician) did not contradict or disagree with Dr. Kurkjian's assessment of Reagan's medical prognosis and restrictions and limitations. Moreover, Dr. Laping agreed that cardiologists, like Dr. Kurkjian, have more insight into the nature of Reagan's chest pain and heart condition than he does.

■  As for Reagan's assertion that UNUM's settlement offer lends credence to his claim, the Court need look no further than to Federal Rule of Evidence 408. Rule 408 provides:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or

offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount.

*Id.; see also New Burnham Prairie Homes, Inc. v. Village of Burnham,* 910 F.2d 1474, 1482 (7th Cir.1990) (holding that "Federal Rule of Evidence 408 authorizes the district court to exclude settlement letters."); *see also Kritikos v. Palmer, Johnson, Inc.,* 821 F.2d 418, 423 (7th Cir.1987) (holding that the objective of Rule 408 is to encourage settlements). Thus, whether or not UNUM made Reagan a settlement offer is irrelevant and does not preclude summary judgment.

■ Finally, the Court cannot say that UNUM's plan administrator's decision to discontinue Reagan's monthly long term disability payments was either arbitrary or capricious. Under the arbitrary and capricious standard, the administrator's decision is to be upheld as long as the decision is based upon a reasonable interpretation of the plan's language and the evidence. *Daill v. Sheet Metal Workers' Local 73 Pension Fund,* 100 F.3d 62, 67–68 (7th Cir.1996); *Russo v. Health, Welfare & Pension Fund, Local 705, Int'l Broth. of Teamsters,* 984 F.2d 762, 765 (7th Cir. 1993). Several factors are to be weighed under the arbitrary and capricious standard: "the impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of experts where necessary, and finally the soundness of the fiduciary's ratiocination." *Chalmers,* 61 F.3d at 1344; *Exbom v. Central States, Southeast and*

*Southwest Areas Health and Welfare Fund,* 900 F.2d 1138, 1142 (7th Cir.1990).

■ Here, the above-factors weigh in UNUM's favor. When UNUM's plan administrator decided to terminate Reagan's benefits, he had before him the following evidence to support his conclusion: (1) the fact that Dr. Kurkjian could find no objective evidence that Reagan suffered from any cardiac disease; (2) the fact that neither Dr. Kurkjian nor Dr. Laping believed that any restrictions or limitations upon Reagan's work capacity were necessary; (3) the fact that Reagan had worked full time at various jobs (sometimes on a full time basis) during the same period in which he claim to be disabled; (4) the fact that the Social Security Administration had found that Reagan was not disabled under the Social Security Act; and (5) the fact that Reagan had worked in several positions which were suitable for his medical condition, were available in the general economy, and were appropriate in terms of his training, education, and recent work experience. Based upon this evidence, the Court cannot say that UNUM's decision to terminate Reagan's disability payments was arbitrary, capricious, or unreasonable. *See Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan,* 144 F.3d 1014, 1021 (7th Cir.1998) (holding that when applying an arbitrary and capricious standard of review, the court's role is to determine whether the plan administrator's decision was "completely unreasonable").

To the extent that Drs. Kurkjian and Laping disagree regarding Reagan's medical condition and ability to work, such a disagreement does not support a finding of arbitrary and capricious[7]. In fact, reasoned differences among qualified medical experts preclude such a finding. *See*

**7.** Because the scope of the Court's review is limited to considering the evidence presented to the plan administrator when he made his decision to discontinue Reagan's disability benefits, the Court has not considered the opinion(s) of Dr. Schwartz in ruling upon UNUM's motion. However, the Court notes

that had it considered Dr. Schwartz's opinion(s), it would have lent support to the Court's conclusion. For example, Dr. Schwartz agreed with Dr. Kurkjian that there is a complete lack of objective evidence to support a conclusion that Reagan suffers from any cardiac disease.

*Smith v. Office of Civilian Health and Med. Program of Uniformed Servs.*, 97 F.3d 950, 959 (7th Cir.1996) (holding that "[w]idespread disagreement among qualified medical experts over a medical issue virtually precludes a reviewing court from concluding that an agency decision that agrees with one side is arbitrary or plainly wrong, even if the court finds other views more persuasive."); *see also Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir.1998) (opining that if a doctor gives his reasons for disagreeing with the opinions of other medical providers, the court must affirm the plan administrator's decision under the deferential standard). Drs. Kurkjian and Laping provided reasoned medical expert opinion regarding Reagan's medical condition, and UNUM's plan administrator did not err in relying upon the one while excluding the other. *See Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership*, 102 F.3d 1435, 1438 (7th Cir. 1996) (holding that a plan administrator's "decision may not be deemed arbitrary and capricious so long as it is possible to offer a reasoned explanation, based on the evidence, for that decision.").

Furthermore, Reagan's assertion that because he was considered to be disabled in 1987, and because his condition had not improved, he must still have been considered to be disabled, as defined by the insurance policy, in 1996 and today neglects the plain language of the policy. *See Daill*, 100 F.3d at 68 (holding that a termination of an ERISA plan's benefits must be based upon the plan's terms and language); *see also Russo*, 984 F.2d at 765 (same). UNUM's plan provided that after

two years, a claimant would be considered to be disabled and would continue to receive monthly disability payments only if he "cannot perform each of the material duties of any gainful occupation for which he is reasonably fitted by training, education, or experience...." (emphasis added). Both Reagan and Dr. Laping have admitted that Reagan has had other substantial gainful employment during the period in which he has been collecting disability benefit payments from UNUM. In fact, Reagan has worked up to 8 hours a day, 5 days a week during this time period.

In addition, after conducting a vocational assessment on Reagan, rehabilitation consultant Roberta Violetta concluded that Reagan's more recent work experiences, which included several positions requiring only sedentary to light exertion, existed in the general economy and were appropriate for him in terms of his training, education, and experience as well as his particular medical restrictions and limitation[8]. Specifically, Ms. Violetta pointed to Reagan's former positions as a telephone solicitor, a sales clerk, an insurance agent, a credit and collection manager, and a telephone service sales representative in support of her conclusion. Thus, it is clear that Reagan could and can perform substantial gainful employment for which he is reasonably fitted by training, education, or experience.

Accordingly, the Court finds that there are no genuine issues of material fact to be decided by the trier of fact and that UNUM is entitled to judgment as a matter of law.[9]

---

8. Ms. Violetta's testimony has not been contradicted by Reagan.

9. UNUM asks the Court to adopt the Sixth Circuit's position for adjudicating ERISA claims on the administrative record rather than employing the traditional mechanisms for deciding a summary judgment motions pursuant to Rule 56. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 617–20 (6th Cir.1998). Although the Court believes that the Sixth Circuit's position has merit for the reasons given in *Wilkins*, the Court also

believes that it would be presumptuous for this Court to adopt the Sixth Circuit's position until the Seventh Circuit does so, especially when there is ample case law in which the Seventh Circuit has reviewed a district court's grant of summary judgment without commenting on the impropriety of using Rule 56 to resolve a claim of wrongful termination of ERISA disability benefits. *E.g. Mers*, 144 F.3d at 1019; *Smart v. State Farm Ins. Co.*, 868 F.2d 929, 931 (7th Cir.1989).

*Ergo,* First UNUM Life Insurance Company's Motion for Summary Adjudication on the Administrative Record, or Alternatively, for Summary Judgment is ALLOWED. Accordingly, pursuant to Federal Rule of Civil Procedure 56, summary judgment is hereby entered in favor of First UNUM Life Insurance Company and against Luther C. Reagan.