IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 7, 2001 Session

## RICHARD WILSON v. THE UNIVERSITY OF TENNESSEE AT CHATTANOOGA

**Appeal from the Chancery Court for Davidson County**
**No. 99-3395-1, Irvin H. Kilcrease, Jr., Chancellor**

---

**No. M2000-02573-COA-R3-CV - Filed December 28, 2001**

---

In this appeal from the Chancery Court for Davidson County Dr. Richard Wilson, the Plaintiff/Appellant, contends that the Chancellor erred in affirming an Administrative Judge's decision that Dr. Wilson engaged in conduct warranting his dismissal as a tenured faculty member at the University of Tennessee at Chattanooga, the Defendant/Appellee, for violation of the University's policy against sexual harassment. We reverse the judgment of the Chancery Court and remand for further proceedings consistent with this opinion. We adjudge costs against the University of Tennessee at Chattanooga.

**Tenn. R. App. P.3 Appeal as of Right; Judgment of the Chancery Court Reversed;**
**Cause Remanded**

HOUSTON M. GODDARD, P.J., delivered the opinion of the court, in which Charles D. Susano, Jr., joined. Herschel P. Franks, J., not participating.

Rebecca Wells Demaree and Andrew Lawrence Berke, Nashville, Tennessee, for the Plaintiff/Appellant, Richard Wilson.

Ronald Courtney Leadbetter, Knoxville, Tennessee, for the Defendant/Appellee, The University of Tennessee at Chattanooga.

### OPINION

This is an appeal from the judgment of the Chancery Court for Davidson County affirming the decision of an Administrative Judge to terminate the employment of the Plaintiff/Appellant, Dr. Richard Wilson as a member of the faculty of the Defendant/Appellee, The University of Tennessee at Chattanooga (hereinafter UTC). Although Dr. Wilson has raised several issues in this appeal, our determination with respect to but one of these issues makes it unnecessary that we address the other issues presented which are, therefore, pretermitted.

The issue addressed in this opinion is restated as follows:

Did the Chancery Court err in affirming the finding of the Administrative Judge that Dr. Wilson engaged in conduct warranting his dismissal as a tenured faculty member for violation of UTC's policy against sexual harassment?

On April 9, 1998, Dr. Wilson, a tenured professor of political science employed by UTC, was conducting his class entitled Comparative Government Asia. During the course of this class Dr. Wilson announced that he was in need of typing assistance because the person who ordinarily did his typing was unavailable. Diana Oo, a student in the class, volunteered to help Dr. Wilson with his typing and he advised her that she would be compensated for doing so.

At Dr. Wilson's instruction, Ms. Oo called him the next morning and made arrangements to meet him that afternoon at a rental house owned by him. The record shows that, at the time, Dr. Wilson rented apartments in this house to UTC students and that his own living quarters were also located there.

Upon her arrival at the rental house, Dr. Wilson conducted Ms. Oono to an apartment in the house which was between tenants and in which he had placed a chair and a desk-type table upon which was set up a laptop computer and a dictaphone. Dr. Wilson showed Ms. Oo how to operate the dictaphone and requested that she type some material which he had previously recorded onto a micro-cassette. Dr. Wilson then left the room and did not return until approximately one hour later by which time Ms. Oo had completed the requested typing. The apartment door was wide open during the time Ms. Oo was inside and the doors to other apartments in the house were visible from the spot where Ms. Oo was typing.

After his return, Dr. Wilson stood behind Ms. Oo, who was still seated, and reviewed her work. Ms. Oo testifies that Dr. Wilson then complimented her typing and touched or massaged her shoulders "a little longer than I thought was the norm." Ms. Oo further testifies that this made her feel "slightly uncomfortable, but I think that ... I thought it was just me. I thought everything was fine."

Dr. Wilson then sat down on a waterbed frame located next to the desk and he and Ms. Oo engaged in conversation for a few minutes until she told him that she would need to leave to meet a friend for lunch. As she and Dr. Wilson were saying good-bye, Ms. Oo attempted to put her shoe back on, having previously removed it to operate the dictaphone. Before she could do so, however, Dr Wilson put it on for her and touched her ankle which Ms. Oo testifies she decided was inappropriate. Ms. Oo states that Dr. Wilson then requested that after lunch she return to type additional material and she agreed to do so because "I was still unsure if what he had done was actually inappropriate and I didn't want to offend him in any way. So I just acquiesced."

At lunch Ms. Oo told her friend, Jyoti Maurya, about being touched by Dr. Wilson. When asked by her attorney how she felt at the time she was talking to Ms. Maurya, Ms. Oo testifies as follows:

Q: How did you feel at the time you were talking to Jyoti?

A: I felt confused.
Q: Did you tell her that?
A: Yes. I told her that I thought it was strange but that I wasn't sure if he intended to be inappropriate.

Ms. Maurya accompanied Ms. Oo upon her return to Dr. Wilson's house when they finished lunch. Ms. Oo attests that Dr. Wilson "seemed less warm and friendly" than he had at their earlier meeting and that he told her that he would no longer need her and would pay her at a later date. Ms. Maurya testified that she heard Dr. Wilson tell Ms. Oo that she could finish the work on some other day. Ms. Oo and Ms. Maurya then left.

The next day Ms. Oo told another friend, Jamie Allison, of her encounter with Dr. Wilson. Ms. Oo testifies that she wasn't sure whether what happened was inappropriate and she wanted to use Ms. Allison as a sounding board.

A few days later Ms. Oo also described Dr. Wilson's conduct to Dr. Foud Moughrabi, acting head of the Political Science Department at UTC. Following a second meeting with Dr. Moughrabi, Ms. Oo encountered Dr. Wilson in a campus parking lot. Ms. Oo attests that Dr. Wilson was very angry that there had been a complaint filed against him and demanded to know what the problem was and what he could do to reconcile the problem. Ms. Oo further testifies that after this confrontation she was very worried about what her grade would be in Dr. Wilson's class.

After her conversation with Dr. Wilson in the parking lot, Ms. Oo contacted Barbara Wofford, an affirmative action officer with UTC., and told her of Dr. Wilson's conduct.

Ms. Oo states that, although she did not want to continue attending Dr. Wilson's class after encountering him in the parking lot, she agreed to do so at Dr. Moughrabi's insistence. Richard Kernea, another student in the class, testifies that prior to the next class meeting he advised Dr. Wilson that he and the other class members, Jeanine Griffey and Kaylene Brooks[1], were aware of Ms. Oo's complaint and that they were all discussing it. When class began Ms. Oo testifies that Dr. Wilson asked her if she had anything to say to which she responded that she did not. Dr. Wilson then announced that he desperately needed a typist. Ms. Oo testifies that she had the impression that Dr. Wilson was trying to make her feel guilty so she volunteered once again to assist him if he would provide her with the necessary equipment and if he would allow her to do the typing at her home. Ms Oo attests that Dr. Wilson then gave her the dictaphone telling her to be sure not to get her foot caught up in the wire again.

Ms. Oo completed the semester in Dr. Wilson's class and received a grade of A which she attests is the grade she deserved. She further attests that Dr. Wilson never acted inappropriately

---

[1]There were only four students in Dr. Wilson's Comparative Asia class - Diana Oo, Richard Kernea, Jeanine Griffey, and Kaylene Brooks.

toward her during the remainder of the semester and treated her just as he treated the other students in the class.

Based upon Ms. Oo's allegations, UTC subsequently filed disciplinary charges against Dr. Wilson. Dr. Wilson requested that the charges be heard in accordance with the contested case provisions of the Tennessee Uniform Administrative Procedures Act as set forth at T.C.A. 4-5-301, *et seq*. By a letter to Dr. Wilson from UTC Chancellor Bill Stacy, Dr. Wilson was charged with:

> 1. Persistent refusal to comply with University policies.
>
> 2. Serious violation of the University's standard of professional responsibility in personal relations with students.

Specifically, the letter from Chancellor Stacy recites Ms. Oo's allegations with respect to the typing incident and the subsequent parking lot confrontation. The letter also makes reference to a charge of sexual harassment brought against Dr. Wilson in 1995 by another student, Rebecca Thompson, and directives prompted by those charges which were addressed to Dr. Wilson in a letter dated July 24, 1996, from Dr.Charles Summerlin who was Acting Provost and Vice Chancellor for Academic Affairs at the time. In that letter, Dr. Wilson was specifically instructed to, among other things, "stop inviting students to his home." and, as stated by Chancellor Stacy, "In general, Dr. Wilson was clearly placed on notice that he must not engage in any action constituting sexual harassment of a student."

On May 16, 1999, a hearing on the charges against Dr. Wilson was conducted before the UTC Administrative Judge who entered an order on September 16, 1999, finding Dr. Wilson guilty of persistent refusal to comply with UTC policies and of violating UTC's standard of professional responsibility in his personal relations with students. As a result of her findings, the Administrative Judge terminated Dr. Wilson's employment as a tenured member of the UTC faculty.

On November 30, 1999, Dr. Wilson appealed to the UTC Chancellor; however, that appeal was denied on December 15, 1999. In addition, on November 24, 1999, Dr. Wilson filed a petition for review in the Chancery Court for Davidson County. The Chancery Court heard oral argument in the case on August 4, 2000, and on September 13, 2000, it issued its memorandum opinion affirming the order of the UTC Administrative Judge. Thereafter, on October 12, 2000, Dr. Wilson filed his notice of appeal to this Court.

Judicial review of the decision of an administrative agency such as UTC is not a *de novo* review and review is limited to the record before the agency. See *Metropolitan Government v. Shacklett*, 554 SW2d 601 (Tenn. 1977). T.C.A. 4-5-322(h), which governs the courts' review of agency decisions, states as follows:

> (h) The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if the rights of the

petitioner have been prejudiced because the administrative findings, inferences, conclusions or decisions are:

(1)  In violation of constitutional or statutory provisions;

(2)  In excess of the statutory authority of the agency;

(3)  Made upon unlawful procedure;

(4)  Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or

(5)  Unsupported by evidence which is both substantial and material in the light of the entire record.

In determining the substantiality of evidence, the court shall take into account whatever in the record fairly detracts from its weight, but the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact.

Our review of a trial court's decision with respect to agency findings is essentially a determination of whether the trial court correctly applied the standard of review set forth at T.C.A. 4-5-322(h).  See *Papachristou v. University of Tennessee*, 29 SW3d 487 (Tenn. Ct. App. 2000).

The specific charges of which Dr. Wilson was found guilty in this case are, as previously stated, "persistent refusal to comply with University policies" and "serious violation of the University's standard of professional responsibility in personal relations with students" both of which are set forth as adequate causes for termination of a tenured faculty member at Section 3.8.5 of the UTC Faculty Handbook.  The record shows that both of these charges derive from Dr. Wilson's alleged violation of UTC's policy against sexual harassment.

The Administrative Judge's finding, and UTC's contention, that Dr. Wilson *persistently* refused to comply with UTC policy appear to be based upon a determination that Dr. Wilson has once again violated  UTC's policy against sexual harassment after being found guilty of violating the same policy based upon the charges brought against him in 1995.  The Administrative Judge also notes that Dr. Wilson failed to abide by Dr. Summerlin's directive that he not invite students into his home as set forth in the July 24, 1996, letter he wrote to Dr. Wilson in consequence of the 1995 charges.  In her order the UTC Administrative Judge notes that the 1995 charges were based upon an incident that occurred when a student went to Dr. Wilson's home to study for a make-up exam.  Although the record does not show that Ms. Oo ever entered Dr. Wilson's actual living quarters or that she was invited to do so, the Administrative Judge determined that a reasonable interpretation of Dr. Summerlin's directive is that Dr.Wilson not invite students to any area of the house which he owned and controlled and in which his own apartment was located.  The Administrative Judge states in her order that the directives in the Summerlin letter "were an appropriate response under the circumstances, and were designed to prevent further sexual harassment.  Wilson ignored Summerlin's directives and engaged in behavior which led to the current charges.  Wilson has, therefore, exhibited a persistent refusal to comply with University policies."

While we do not dispute that the directives set forth in the letter from Dr. Summerlin were, as the Administrative Judge states, "an appropriate response under the circumstances and were designed to prevent further sexual harassment", we do not agree that these directives reflect UTC policy or that Dr. Wilson's failure to abide by any of these directives in itself constitutes a refusal to comply with UTC policy. Recognition of Dr. Summerlin's directives as UTC policy would serve to subvert the powers of the University of Tennessee's Board of Trustees which is vested with "full and complete control" of the organization and administration of UTC and is designated as the body which shall establish policies concerning the general operation of UTC. See UTC Faculty Handbook Section 1.2.3.2. which sets forth Article 1 Section 1 of the bylaws of the University of Tennessee. We also note the statement of counsel for UTC at the hearing before the Administrative Judge that the letter from Dr. Summerlin "is not a policy; it is a warning letter." Therefore, a determination of whether Dr. Wilson failed to abide by the directive that he not invite students into his home is not relevant to the question of whether he persistently refused to comply with UTC policy. The UTC policy at issue in this case is the policy against sexual harassment and, accordingly, the question which must be addressed in this case is whether Dr. Wilson's conduct toward Ms. Oo constituted a violation of that policy.

Title VII of the Civil Rights Act of 1964 prohibits employment discrimination on the basis of sex. See 42 U.S.C. 2000e-2(a)(1). Furthermore, the United States Supreme Court has recognized that the sexual harassment of a subordinate by a supervisor in an employment situation constitutes unlawful discrimination under Title VII. See *Meritor Savings Bank, FSB v Vinson*, 477 U.S. 57, 106 S. Ct. 2399, 91 L.Ed.2d 49 (1986). Federal regulations set forth at 29 C.F.R. 1604.11(a) provide the following guidelines defining hostile environment sexual harassment, as appears to be alleged in the present case, in an employment setting:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitutes sexual harassment when ... (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

Title IX of the Educational Amendments of 1972, 20 U.S.C. 1681 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance..." The Sixth Circuit Court of Appeals has acknowledged that the elements required to state a hostile environment sexual harassment claim under Title VII apply equally under Title IX. See *Doe v. Claiborne County,Tenn.*, 103 F.3d 495 (6th Cir. 1996).

In her order, the Administrative Judge acknowledges that under Title VII sexual harassment case law "for there to be liability for hostile environment sexual harassment, 'conduct must be severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and the victim must subjectively regard that environment as abusive.'" Citing *Black v. Zaring*

*Homes, Inc.,* 104 F.3d 822, 826 (6th Cir. 1997). Under the facts presented in the case before us we do not deem that the conduct attributed to Dr. Wilson by Ms. Oo was sufficiently pervasive or severe to sustain a cause of action for sexual harassment under this standard. The encounter between Dr. Wilson and Ms. Oo out of which this case arose occurred in 1998 and is, therefore, too remote, in our view, from the 1995 incident of sexual harassment to be considered pervasive on that basis. Also, other than the 1995 incident and the current charge, the record reveals no other allegations that Dr. Wilson engaged in sexual harassment while employed at UTC. Although in *McClellan v. Board of Regents of the State University*, 921 SW2d 684 (Tenn. 1996), the Tennessee Supreme Court recognized that a single incident of sufficient severity may be actionable as sexual harassment, we do not find that Dr. Wilson's actions towards Ms. Oo were of such severity. In this regard we are guided by the Sixth Circuit Court of Appeals case of *Burnett v. Tyco Corporation,* 203 F.3d 980 (6th Cir. 2000) where the Court found that allegations by a female employee that the defendant employer's personnel manager had placed a pack of cigarettes containing a lighter inside her tank top and brassiere and had, on two separate occasions, made sexually offensive remarks to her were insufficient to create a genuine issue of material fact as to whether the conduct was sufficiently severe to support a finding of hostile working environment under Title VII.

UTC and the Administrative Judge assert that, even if Dr. Wilson's conduct is not such as would impose liability on UTC under Title VII's sufficiently 'severe or pervasive' standard, the law permits an employer to take prompt effective action *before* an employee's conduct persists to the point where the employer is subject to liability. UTC cites the following cases in support of this proposition: *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340 (7th Cir. 1995); *Howard v. Department of Air Force*, 877 F.2d 952 (Fed. Cir. 1989) and *Carosella v. United States Postal Service*, 816 F.2d 638 (Fed. Cir. 1987).[2] Additionally, UTC cites *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 118 S. Ct. 1989, 141 L Ed.2d 277 (1998) for the proposition that it is not only permitted to take such action, but is obligated to do so if it has received actual notice of sexual harassment by a teacher and it intends to establish a defense to liability under Title IX.

UTC's policy on sexual harassment is set forth at Section 4.2.2. of the UTC Faculty Handbook as follows:

> 4.2.2. Sexual Harassment Policy
>
> The University of Tennessee at Chattanooga recognizes that harassment in the University on the basis of sex is a violation of Section 703 of Title VII. For this reason, the University is adding this statement and the following guidelines to the *Faculty Handbook*, the University Personnel Policy Manual and the *Student Handbook.*

---

[2] In her order of September 16, 1999, the Administrative Judge also cites *Hubrig v. Lockheed Martin Energy Sys., Inc.*, an unreported opinion of this Court filed in Knoxville, on May 4, 1998. The *Hubrig* case is designated " Permission to Appeal Denied, Concurring in Results Only." Amendment to Rule 4 of the Rules of the Tennessee Supreme Court, which became effective November 1, 1999, and which is applicable to intermediate appellate court decisions rendered prior to that date, provides that cases so designated have no precedential value.

Sexual advances by any UTC employee (faculty or staff member) toward another employee or student which become a condition of employment or affect the academic relationship constitute an unlawful practice. Unsolicited or unwelcome physical or verbal behavior of a sexual nature which has the purpose of creating an atmosphere of intimidation is a violation of Title VII.

In the case of such harassment, an employee or student has the right to pursue the EEO grievance procedure for redress. The affirmative action officer should be contacted for this procedure.

*Guidelines*: Sexual harassment in the workplace has long been recognized by the EEOC as violation of Section 703 of Title VII of the Civil Rights Act of 1964, as amended. Sexual harassment in the workplace is gender-based discrimination which violates Title VII and constitutes an unlawful employment practice. Additional cases involving issues of sexual harassment are being litigated now both by EEOC and private parties.

The question of whether a particular action or incident establishes a purely personal, non-employment related relationship requires a factual determination. In making such a determination, the case record as a whole, as well as the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred, will be examined. The determination of the legality of a particular action will be made from the facts, on a case by case basis, because the same behavior may constitute sexual harassment in one context but not in another.

Sexual harassment, like racial harassment, generates a psychologically harmful atmosphere. Employees and students are guaranteed a working and learning environment free of discriminatory intimidation, whether racial or sexual. Therefore, UTC has an affirmative duty to maintain an atmosphere free of sexual harassment and intimidation. The best way to achieve such an environment is to prevent sexual harassment from occurring at all, by utilizing all possible methods to alert the employees and students to the problem and to stress that sexual harassment, in any form, will not be tolerated.

We do not dispute UTC's right to take remedial action before an employee's conduct continues to the point where UTC is subject to liability and we agree that, for the purpose of taking such action, UTC is not bound by case law defining what constitutes sexual harassment under Title VII. However, we are compelled to note that throughout it's stated policy on sexual harassment as set forth above, UTC refers to sexual harassment as being a violation of Title VII. If, for the purposes of remedial action, UTC decides to adopt a more stringent policy than is required to establish liability under Title VII case law, an employee, like Dr. Wilson, who is charged with violation of such policy must be sufficiently apprised of the stringency of UTC's stance and must be alerted to the perimeter of the policy to which he is subject. See *Chalmers*, *ibid.* Our review of

the record in this case does not convince us that Dr. Wilson was provided with adequate information from which he could have inferred that his behavior toward Ms. Oo would violate UTC's policy against sexual harassment. Although we recognize the previous charge of sexual harassment brought against Dr. Wilson in 1995 as well the letter written to him by Dr. Summerlin in consequence of those charges, we do not find that either the circumstances of the prior incident or the contents of Dr. Summerlin's letter would have served to place Dr. Wilson on notice that UTC would consider the conduct of which he is currently accused to be a violation of its policy against sexual harassment.

With respect to the charge of sexual harassment brought against Dr. Wilson in 1995, the record shows that this charge was based on allegations that Dr. Wilson kissed and hugged a female student and that he refused to give her an A in his course after she resisted his advances. The fact that UTC deemed such overtly sexual behavior coupled with the element of *quid pro quo* to constitute sexual harassment would not have been sufficient to alert Dr. Wilson that UTC's definition of sexual harassment might encompass the conduct of which he is accused in the present case. In contrast with the 1995 incident, Ms. Oo's own testimony makes evident the ambiguous nature of Dr. Wilson's actions in the present matter. Although, as set forth above, Ms. Oo attests that when Dr. Wilson touched her ankle she decided this was inappropriate, she also testifies that, thereafter, she agreed to return to do more typing because she "was still unsure if what he had done was actually inappropriate" and that she told her friend, Ms. Maurya, that she thought Dr. Wilson's conduct was "strange" but that she "wasn't sure if he intended it to be inappropriate."

The letter written to Dr. Wilson from Dr. Summerlin as a result of the 1995 charge instructs him to discontinue certain practices "because they have the potential for compromising professional relationships between faculty and students." The letter does not state that UTC considers any of the designated practices to be conduct amounting to sexual harassment but only that such practices are "ill advised and contribute substantially to concerns about the environment you are fostering with respect to students." We find nothing in this letter which would have placed Dr. Wilson on notice that UTC would consider his behavior toward Ms. Oo in the present case to be sexual harassment.

Finally, a review of the behavior complained of in each of the four cases cited by UTC in support of its right to take prompt remedial action accentuates the relatively innocuous nature of Dr. Wilson's conduct toward Ms. Oo in the present case. In *Chalmers v. Quaker Oats Co.*, 61 F.3d 1340 (7th Cir. 1995) a company officer was discharged for kissing a female employee without invitation. In *Howard v. Department of the Air Force*, 877 F.2d 952 (Fed. Cir. 1989) an employee was discharged for, among other things, suggesting to a female co-worker that they "make wild love all afternoon" and for grabbing and kissing another female employee and asking her about her breast size and sex drive. *Carosella v. United States Postal Service*, 816 F.2d 638 (Fed. Cir. 1989) involved a supervisor who was discharged for, among other things, putting his arm around a female employee and asking her out for a date and for kissing another female employee on several occasions and offering to have her clocked in so that she could be paid to go out with him. And *Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) involved a high school teacher whose employment was terminated when it was discovered that he was engaging in sexual intercourse with one of his female students.

It is our conclusion that the sexual harassment policy of UTC as set forth in its Faculty Handbook did not sufficiently apprise Dr. Wilson that UTC might consider the conduct attributed to him in this matter to be sexual harassment. Nor do we find that UTC supplemented such policy as set forth in the Handbook or that Dr. Wilson's conduct was of such gravity that he should have otherwise known that it would violate UTC's policy against sexual harassment. Accordingly, we find that the Administrative Judge's decision to terminate Dr. Wilson's employment based on findings that he persistently refused to comply with UTC policy and seriously violated UTC's standard of professional responsibility in personal relations with students was arbitrary and, therefore, we conclude that the Chancery Court erred in affirming the opinion of the Administrative Judge.

For the foregoing reasons we reverse the judgment of the Chancery Court and remand for such further proceedings, if any as may be necessary, and collection of costs below which are, as are costs of appeal, adjudged against the University of Tennessee at Chattanooga.

_____
HOUSTON M. GODDARD, PRESIDING JUDGE