**Mark HUGHES, Plaintiff,**

v.

**LIFE INSURANCE COMPANY OF NORTH AMERICA, Defendant.**

**No. IP 99–1143–C–B/S.**

United States District Court, S.D. Indiana, Indianapolis Division.

Sept. 5, 2000.

James D. Crum, Coots, Henke & Wheeler, Carmel, IN, for plaintiff.

Cynthia M. Locke, White & Raub, Indianapolis, IN, for defendant.

## ENTRY GRANTING DEFENDANT'S MOTION TO STRIKE AND DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, Mark Hughes ("Hughes"), alleges that Defendant, Life Insurance Company of North America ("LINA"), in bad faith denied Hughes long-term disability benefits. In our Entry of February 29, 2000, we held that Hughes' claims were completely preempted by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, and that the factual allegations in plaintiff's complaint were sufficient to state a claim for benefits under ERISA § 502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)). LINA now moves for summary judgment, pursuant to Federal Rule of Civil Procedure 56, claim-

ing that the administrative record, when examined under the proper standard of review, supports a judgment in its favor as a matter of law. LINA also moves to strike an affidavit Hughes relies on in opposition to the motion for summary judgment. For the reasons discussed below, we *GRANT* LINA's motion to strike and *DENY* its motion for summary judgment.

## Background Facts

### A. *LINA'S Motion to Strike*

██ As discussed below, we review LINA's motion for summary judgment under an "arbitrary and capricious" standard of review. *See infra.*[1] An arbitrary and capricious standard of review of a discretionary ERISA administrative decision is specifically limited to an examination of the administrative record generated by the plan administrator. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan,* 195 F.3d 975, 982 (7th Cir.1999) (adopting this position and collecting cases of other circuits in agreement); *see also Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan,* 102 F.3d 1435, 1438 n. 1 (7th Cir. 1996). ("The only relevant materials at the time [a district court rules on summary judgment are] the materials that were before the [plan administrator] when it reached its decision."). Although the parties may be allowed to engage in further discovery and present new evidence in conjunction with a de novo review of the plan administrator's decision, we do not permit the parties to present such new evidence to us "where the question is whether a decision is supported by substantial evidence, or is arbitrary and capricious." *Perlman,* 195 F.3d at 982; *see also Trombetta,* 102 F.3d at 1438 n. 1 (affirming district court's decision to deny plaintiff's

request for discovery to support its position that the ERISA plan administrator's denial of benefits was arbitrary and capricious).

In support of his position on summary judgment, Hughes attempts to rely on an affidavit of Dr. Keith Keener, one of his treating physicians. *See* Affidavit of Keith Keener, M.D. Hughes makes no claim that the affidavit was provided to LINA at any time during its review of his benefits request; rather, the affidavit is presented to us as additional evidence to support Hughes' position that LINA's decision was wrongly made. Since the Keener Affidavit is not a part of the administrative record generated by LINA during its review of Hughes' claims, we will not consider it. Accordingly, LINA's motion to strike is *GRANTED.*

### B. *Factual Record*

Hughes was employed as a "Safety Manager" for Fluor Corporation ("Fluor").[2] *See* Plaintiff's Statement of Additional Material Facts ("Pl.'s Add'l Facts") ¶ 78. In this capacity, Hughes was stationed in Mexico in late 1996 to oversee the clean-up of a petroleum plant explosion. *See* Compl. ¶ 6; Affidavit of Rodney Stief, Ex. 3, Bates No. ("R.at") 0000144, April 21, 1997, Office Notes of Dr. Paul R. Becherer ("Dr.Becherer"). At the time, Hughes noted that some of his co-workers at the site were complaining of sinus symptoms. *See* R. at 0000144. After seven months in Mexico, Hughes returned to the United States in December, 1996, and, according to Fluor's records, his last day of work was January 7, 1997. *See* Compl. ¶ 6; Statement of Material Facts ("Mat.Facts") ¶ 9; R. at 000144.

LINA issued to Fluor a group long-term disability policy ("the policy") for its employees. *See* Mat. Facts ¶ 1. According to

---

1. Both parties agree that this standard governs our review. *See* Memorandum in Support of Motion for Summary Judgment ("Def.'s Mem.") at 13–15; Plaintiff's Memorandum in Response to Defendant's Motion for Summary Judgment ("Pl.'s Resp.") at 11.

2. The parties do not inform the court as to the nature of Fluor's business.

the policy, "[a]n employee will be considered Disabled if because of his Injury or Sickness he is unable to perform all the material duties of his regular occupation;...." Mat. Facts ¶ 4. Eligibility by Fluor employees for long-term disability insurance benefits ceases on:

. . . . .

(4) the date the Employee's Active Service ends *except* as set forth below.

(a) If the Employee's Active Service ends *due to Disability* for which Monthly Benefits are or may become payable, the insurance will continue while that Disability continues during the Benefit Waiting Period and thereafter but only for as long as monthly Benefits are payable for Disability or Residual Disability.

Mat. Facts ¶ 2 (emphasis added). "Active Service" is further defined to mean that:

the Employee is in active employement [sic]. You will be considered in active employment with the Employer on a day which is one of the Employer's scheduled work days if he is performing in the usual way all of the regular duties of his work for the Employer on a full time basis on that day, either at one of the Employer's usual places of business or at some location to which the Employer's business requires him to travel. An Employee will be deemed in Active Service on a day which is not one of the Employer's scheduled work days only if he was in Active Service on the preceding scheduled work day.

*Id.* ¶ 3.

Fluor, the plan administrator of the policy, delegated to LINA, as claim administrator:

[t]he discretionary authority to interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan. Such discretionary authority is intended to include but is not limited to, the determi-

nation of the eligibility of persons desiring to enroll in or claim benefits under the plan, the determination of whether a person is entitled to benefits under the plan and the computation of any and all benefits under the plan. The plan administrator [Fluor] has also delegated to [LINA] as claim administrator the discretionary authority to perform a full and fair review, as required by [ERISA] of each claim denial which has been appealed by the claimant or his/her duly authorized representative.

Mat. Facts ¶ 5.

Hughes submitted a claim for long-term disability benefits to LINA on October 27, 1997, stating that he became disabled on January 1, 1997, as a result of "complications caused by inhalation of toxic substance while on fire rebuild job in Mexico [which] led to nephrotic syndrome and atrill [sic] fibrillation and atrill [sic] flutter." Mat. Facts ¶ 8. The parties agree that Hughes' "Active Service" ended on January 7, 1997. *See id.* ¶ 9. Thus, under the terms of the long-term disability policy, Hughes qualified for benefits only if his "Active Service" ended on January 7, 1997, "due to Disability." *See id.* ¶ 2.

### 1. Medical History

During LINA's investigation of Hughes' claim for long-term disability benefits, the following medical history was developed and documented.[3] On January 20, 1997, Hughes first sought medical treatment from Dr. Martin van Cleeff ("Dr. van Cleeff") complaining of sinus congestion, chest congestion, occasional chill, chest tightness and wheezing. *See* Mat. Facts ¶ 46; Pl.'s Add'l Facts ¶ 79. Dr. van Cleeff diagnosed Hughes with sinusitis and bronchitis and prescribed a course of antibiotics. *See* Mat. Facts. ¶ 46; Pl.'s Add'l Facts ¶ 79. Dr. van Cleeff made no mention at this time that he believed Hughes was or should be kept away from work

---

**3.** As described more fully below, LINA obtained all of Hughes' medical history referenced herein prior to its initial decision regarding his claim for long-term disability benefits.

because of his symptoms. *See* Mat. Facts. ¶ 46. Hughes' next documented contact with a doctor was a January 31, 1997, phone call to Dr. van Cleeff in which Hughes reported that he had improved slightly, but that the symptoms persisted; in response, Dr. van Cleeff authorized further antibiotics but did not consider the problem severe enough to warrant an office visit. *See id.* ¶ 47.

The record is devoid of any reference to further contact between Hughes and a doctor until a March 10, 1997, visit to Dr. van Cleeff. *See id.* ¶ 48. Hughes continued to complain of a sinus infection, and further noted recent swelling in his feet; Dr. van Cleeff diagnosed Hughes with chronic sinusitis, found "1+ pitting edema," and prescribed more antibiotics. *See id.;* R. at 000173. Once again, there is no indication that Dr. van Cleeff considered the diagnosis to require Hughes to remain off work, or that he recommended to Hughes that he not work. *See id.*

On March 20, 1997, Hughes had a final appointment with Dr. van Cleeff, this time receiving a complete physical. *See id.* ¶ 49. Dr. van Cleeff listed Hughes' problems as obesity, chronic sinusitis, and edema (noting however, that the edema was "much improved);" according to Dr. van Cleeff's notes of this visit, Hughes denied suffering from any other significant symptoms. *See id.* Upon examination, Dr. van Cleeff found "2+ edema" in Hughes' extremities, significant proteinuria—protein in the urine—and diagnosed Hughes with nephrosis. *See id.* ¶¶ 22, 50; Pl.'s Add'l Facts ¶ 81. Dr. van Cleeff prescribed further antibiotics for the chronic sinusitis and prescribed Lasix and potassium chloride for the edema and referred Hughes to Dr. J. Keith Keener ("Dr.Keener"), a nephrologist, for a follow-up visit. *See* Mat. Facts ¶ 50; Pl.'s Add'l Facts ¶ 82. Dr. van Cleeff's notes do not indicate that at any time during his visit he recommended to Hughes that he remain off work. *See* Mat. Facts ¶ 51.

Dr. Keener first saw Hughes in his office on March 27, 1997. *See id.* ¶ 23. In a letter written to Dr. van Cleeff following this visit, Dr. Keener reported that Hughes' history and physical condition were significant for "apparent skin problems, very mild liver problems, as well as whatever his renal process is." *Id.* Dr. Keener ordered a full serologic work-up as well as sinus and chest films, but saw no reason to undertake any acute therapeutic or diagnostic maneuvers. *See id.* Dr. Keener further noted that

> [g]iven [Hughes'] wide travel and chemical exposure, *we may be dealing with either an infectious process* such as post-infectious glumerulopathy related to any number of viruses including hepatitis viruses as well as a chronic phenomenon related to viruses such as cryoglobulinemia related to hepatitis C virus. Then, *also the possibility of chemical exposures affecting both systems should be considered.*

R. at 000381 (emphasis added). However, nowhere in Dr. Keener's notes did he indicate that Hughes was off work as a result of his symptoms, or that he needed to be off work as a result of these symptoms. *See* Mat. Facts ¶ 24.

On April, 21, 1997, Dr. Keener referred Hughes to Dr. Paul R. Becherer, an infectious disease specialist. *See id.* ¶ 25. Dr. Becherer's office notes of the April 21, 1997, visit describe Hughes as a "50–year-old male in previous good health who presents with nephrotic syndrome of unclear origin. The question was whether any of his travels and exotic exposures might be precipitating his nephrotic syndrome." R. at 000143. According to the treatment notes, Hughes started noticing edema in his lower extremities approximately six to eight weeks prior to his visit and Dr. Becherer found "1 to 2+ lower-extremity edema." *See id.* at 000144; Mat. Facts. ¶¶ 28, 29. Dr. Becherer further recorded that Hughes "certainly has had a wide range of chemical and environmental exposures which I feel may have contributed to his

illness." R. at 000143. Although Hughes associated the edema with his prior sinus congestion, Dr. Becherer apparently did not "have a way of tying those two processes together." *Id.* The doctor estimated the likelihood of infection contributing to Hughes' illness at less than five percent. *See id.* Dr. Becherer later told Hughes, in a June 11, 1997, letter, that it was very unlikely that infection had played any role in the development of nephrotic syndrome. *See* Mat. Facts ¶ 26. Dr. Becherer's notes provide no indication that Hughes was or should be off work as a result of his illness. *See id.* ¶ 30.

On June 23, 1997, Hughes was hospitalized at the Wake Forest Medical Center in Raleigh, North Carolina when, according to the treatment notes of Dr. John R. Sinden ("Dr. Sinden"), he presented to the emergency room with increasing edema. *See id.* ¶ 35. Further work-up revealed that Hughes was in atrial fibrillation. He was admitted to the hospital where he was diagnosed with congestive cardiomyopathy with secondary edema, moderate concentric left ventricular hypertrophy, atrial fibrillation and atrial flutter, hypertension, and atrial enlargement. *See id.;* Plaintiff's Response to Defendant's Statement of Material Facts ("Pl.'s Resp. to Mat. Facts") ¶ 35. Hughes indicated to medical staff that "[h]e has had edema for several months now waxing and waning in severity." Pl.'s Facts ¶ 84; R. at 000254 (Discharge Summary of Dr. Sinden). Hughes was placed on Coumadin therapy and diuretics, including intravenous doses of Lasix that reduced Hughes' weight from an admission weight of 302 pounds to a discharge weight of 274 pounds. *See* Mat. Facts ¶ 35; R. at 000254. Hughes was discharged from the hospital on July 1, 1997, with instructions to follow up with Drs. Sinden and van Cleeff. He continued in Dr. Sinden's care until October 23, 1997. *See* Mat. Facts ¶ 35; Pl.'s Facts ¶ 84.

### 2. LINA's investigation of Hughes' claim

In support of his claim, Hughes submitted to LINA attending physician statements ("APS") from Dr. Keener and Dr. Sinden. *See* Mat. Facts ¶ 10. Dr. Keener's APS indicates that he first treated Hughes on March 27, 1997, although he failed to fill out the line on the form that called for the date he felt Hughes was first unable to work due to the illness. *See id.* ¶ 11 (citing R. at 000499). Dr. Keener also noted his opinion that the illness was work-related and linked Hughes' hospitalization from June 23, 1997, through July 1, 1997, to the same illness for which Dr. Keener had been treating him. *See* R. at 000499. Dr. Keener directed LINA to contact Dr. Sinden for information related to Hughes' hospitalization and indicated to LINA that Dr. Keener was unable to comment on Hughes' current condition as he has not seen him since his discharge from the hospital. *See id.* at 000500. Dr. Sinden's APS, dated October 16, 1997, also classified Hughes' illness as work related and noted January, 1997, as the date when Hughes was first unable to work. *See id.* at 000501–02. Dr. Keener had not filled out any of the areas on the APS relating to Hughes' physical or mental limitations, or a prognosis for his return to work; however, Dr. Sinden's APS provided this information. *Compare* R. at 000500 *with* R. at 000502.

Under the "physical limitations" heading of the APS, Dr. Sinden listed Hughes' functional capacities as being limited but that he retained the capacity to: frequently lift and/or carry up to twenty pounds; occasionally lift and/or carry up to twenty pounds; stand and/or walk a total of less than three hours; sit a total of six to eight hours. *See id.* at 000502. Further, Dr. Sinden opined that Hughes was "limited" in his ability to push and/or pull, climb, bend, and stoop, although he failed to describe the degree of these limitations. *See id.* Dr. Sinden further noted that he felt Hughes was not capable of performing any occupation, was not a suitable candidate for physical or vocational rehabilitation (without explanation), and that his present

job could not be modified to allow for handling the impairment. *See id.*

Dr. Sinden also completed a "Physical Capabilities" form, dated November 17, 1997, conveying his opinion that Hughes was unable to work in an environment where he was not protected from weather, or was exposed to extreme heat or cold, humidity, gases, odors, fumes, or mists. *See* R. at 000259.1–60. In the section allocating the percentages of Hughes' day that could be dedicated to certain physical activities, Dr. Sinden indicated that Hughes could perform, as a percentage of his usual workday, the following activities "occasionally, 1%—33%": bending/stooping, squatting, crawling, climbing, reaching above shoulder level, kneeling, and balancing. *See id.* at 000259. Dr. Sinden also reported that, as a percentage of his usual workday, Hughes should use his head and neck "occasionally, 1%—33%" in: extension movements, static position, rotational movements, and flexing movements. *See id.* at 000259.1. Finally, Dr. Sinden reported that Hughes could lift up to ten pounds and carry up to ten pounds a "short" distance. *See id.* Dr. Sinden left blank the section in which he was to indicate his opinion as to the type of work Hughes could perform, given his limitations (i.e. very heavy work, heavy work, medium work, light work, or sedentary work). *See id.* at 000260.

In a fax sent from Fluor to LINA on December 3, 1997, Fluor provided a description of the physical demands of Hughes' job, prepared by Cole Williams and J.D. Bradfield on November 24, 1997. *See* R. at 000430–434. Hughes had worked as a "Safety Manager—Cactus 1 Rebuild from fire/explosion." R. at 000431. Hughes' day was spent bending/stooping, squatting, and kneeling only "occasionally, 1%—33%." *See id.* at 000432. While Hughes was never required to crawl, he was "frequently, 34%—

66%" required to climb and reach above shoulder level. *See id.* Hughes' position required him to carry or lift up to ten pounds, and he was only "occasionally, 1%—33%" required to use his head or neck in a static position, rotational movements, flexing movements, and extension movements. *See id.* Further, this description indicated that Hughes' position required him to work outdoors with no effective protection from weather, exposed him to extreme heat, humidity, hazards (hydrogen sulfides and asbestos), gases (hydrogen sulfides, propane, and butane), dusts (demolition and construction in existing facilities), odors (sulfur and gas plant fumes), "some" fumes, and mists (cooling tower water with treating chemicals). *See id.* at 000433. In addition, a previous job description, dated December 18, 1995, listed a safety manager's responsibilities to include administering programs on-site, as well as managing employees working in the safety department, also presumably on-site. *See* R. at 000507.[4]

On October 31, 1997, LINA notified Hughes it had received his claim and had sent medical records requests to Drs. van Cleeff, Keener, Sinden, and the Raleigh, North Carolina hospital where he had been hospitalized in late June of 1997. *See id.* ¶¶ 13, 14. On November 14, 17, and 24, 1997, Lucinda M. Hackett–Wade ("Hackett–Wade"), the LINA Benefit Analyst overseeing Hughes' claim, spoke with Hughes to inform him that LINA required further medical records. *See id.* ¶¶ 15, 16, 18. As of November 24, 1997, all LINA had received from the various doctors who had treated Hughes were the two APSs referenced above and a response from Dr. Keener indicating that he had treated Hughes between March 27, 1997, and June 20, 1997. *See id.* ¶¶ 10, 17. On November 24, 1997, Hackett–Wade re-contacted the offices of Drs. van Cleeff and Keener to request medical information related to

---

4. Hughes on-site role at explosions is also referenced in Dr. Becherer's office notes describing Hughes' most recent position to re-

quire him to be in Mexico to help clean up from an explosion at a gas plant. *See* R. at 000144.

their past treatment of Hughes. *See id.* ¶¶ 19, 20.

Eventually, LINA received Dr. Keener's medical records, including the March 21, 1997, letter from Dr. van Cleeff containing the initial referral of Hughes to Dr. Keener and Keener's March 29, 1997, letter to Dr. van Cleeff describing Keener's initial examination of Hughes. *See id.* ¶¶ 22–23. Dr. Keener's records also included notes from Hughes' visit to Dr. Becherer and the June 11, 1997, letter from Dr. Becherer to Hughes reciting Dr. Becherer's conclusions. *See id.* ¶¶ 25–30.

On November 25, 1997, LINA received additional medical records from Hughes himself, apparently gathered by him in pursuit of a short-term disability claim for the same period of time and provided to CORE, the company reviewing that claim *See id.* ¶ 31. Included among these documents was an APS from Dr. van Cleeff, dated July 11, 1997, in which Dr. van Cleeff indicated that the date of Hughes' injury or illness, as well as the first date of disability, was March 10, 1997, with a primary diagnosis of congestive cardiomyopathy. *See id.* ¶¶ 32–33. Finally, on or about December 5, 1997, LINA received medical records from Dr. Sinden, the cardiologist who first treated Hughes on June 23, 1997, upon his emergency admission to the Wake Forest Medical Center. *See id.* ¶¶ 34–35.

On December 8, 1997, LINA received a fax from Dr. van Cleeff, accompanied by a copy of a letter dated July 24, 1997, which he had written, presumably to someone at CORE, relating to CORE's review of Hughes short-term disability claim. *See id.* ¶ 37. We quote the entire text of the letter, as LINA's consideration of it assumes substantial importance in this dispute:

It has come to my attention that there is a great deal of confusion regarding the disability benefits of Mr. Hughes. This unfortunate gentleman has had a series of difficult and evolving medical problems that have required referral and consultation of Keith Keener, MD of Wake Nephrology and John Sinden, MD of Raleigh Cardiology.

Due to the complexity of these issues and to clarify the situation I feel that the following is the only appropriate course of action: concerning [Hughes'] disability prior to 6/23/97 [the date of Hughes' hospital admission from the emergency room] all determinations should be made by Dr. Keener. All determinations subsequent to this date should be made by Dr. Sinden. I am therefore removing myself from this process.

R. at 000241; Mat. Facts ¶ 37. Hackett–Wade contacted Dr. van Cleeff's office on December 9, 1997, explaining that LINA needed certification from Dr. van Cleeff that Hughes was disabled as of January 8, 1997, and indicating that the faxed letter was insufficient. *See* Mat. Facts ¶ 38. Dr. van Cleeff's office advised Hackett–Wade that this letter was the doctor's only response to LINA's request for medical records. *See id.*

Rather than accepting Dr. van Cleeff's recommendation that Dr. Keener be asked to certify Hughes' disabled status in January, 1997, Hackett–Wade informed Hughes that Dr. Keener could not certify Hughes' disability status back to January 8, 1997, the date following Hughes' last day of Active Service under the policy's terms, as Keener had not begun treating Hughes until March 27, 1997. *See id.* ¶ 39. The day following LINA's receipt of the fax from Dr. van Cleeff's office, someone from van Cleeff's office called to inform Hackett–Wade that "Dr. van Cleeff did not start treating Mr. Hughes until 3/10/97 for his disability." R. at 000234. Dr. van Cleeff's office refused to send its office notes directly to LINA for the review in connection with Hughes' claim. *See id.*

On December 16, 1997, Hackett–Wade transferred the LINA file to Jeffrey Smith ("Smith"), Senior Case Manager, for his review. *See* Mat. Facts. ¶ 41. Upon com-

pletion of his review, Smith noted as follows:

A review of the information on file indicates a lack of supportive medical evidence as of the time this claimant ceased work in 1/97. The earliest medical evidence we have been unable [sic] to obtain is from 3/97 which indicate a variety of complaints such as nephrotic syndrome, CHF, atrial fibrillation, severely decreased EF.., etc. We have not been able to document a condition of disability as of 1/8/97, the last day worked. While it appears as if the claimant's medical problems were actively treated from 3/97 and forward, we have no information on his status as of [the last day worked].

Dr. Van Cleef [sic] has indicated clearly that his office will not address the status of this patient as of 1/97. It appears as if Dr. Van Cleef [sic] is the only physician who treated the claimant at that time, but without his records or a report regarding Mr. Hughes' condition, [total disability] as of the last day work [sic] cannot be documented. Dr. Becherer's 4/21/97 report does state that the claimant has a progressive process, however he references a history of these complaints without fully documenting how these conditions progressed to the point of total disability as of 1/97.

As an effort to exhaust all possibilities, I would suggest calling the [worker's compensation] carrier to see if they have or have access to medical. In addition, the claimant should be made aware that without the records or a report detailing his condition as of his [last day worked] through 3/97, our decision will be based on the information on file.

R. at 000231. Between December 18 and December 22, 1997, the worker's compensation carrier forwarded copies of its medical records on Hughes' claim to Hackett–Wade; although most of these records duplicated documents already obtained by LINA, Dr. van Cleeff's office notes were included in these materials. *See* Mat. Facts ¶¶ 43. This point marks the first time LINA had access to, and was able to review, Dr. van Cleeff's notes regarding Hughes' visits to him on January 20 and 31, 1997, and March 10 and 20, 1997. *See* Mat. Facts ¶¶ 46–52.

On December 23, 1997, a representative of Fluor faxed information to Hackett–Wade from CORE concerning its review of Hughes' short-term disability claim. *See id.* ¶ 53. The CORE notes document a phone call from Dr. van Cleeff, during which he reportedly said that he had not judged Hughes to be disabled from January 1, 1997 to March, 1997. Dr. van Cleeff explained that, while he saw Hughes for a sinus problem in January, 1997, he did not order Hughes to stop working at that time and there was zero edema present. Even when Hughes presented with 1 to 2+ edema on March 10, 1997, Dr. van Cleeff did not direct him to take off work. Dr. van Cleeff informed CORE that at no time during his treatment of Hughes did he discuss disability with Hughes, not even in March, 1997, when he referred Hughes to Dr. Keener. *See id.* ¶ 55.

The CORE notes also document a phone call between a CORE physician and Dr. Keener in July, 1997. Dr. Keener reported his belief that 1 to 2+ edema did not physically disable Hughes. The notes state that Dr. Keener "feels strongly that for the entire period from 1/1[/97] to 6/3[/97 Hughes] should not have left the country, and should not have been exposed to toxins—other than that he could have worked. We discussed the use of a respirator type mask in case of possible toxin exposure, but [Dr. Keener] felt the possibility of other methods of exposure precluded any risk at all." R. at 000102.[5]

---

5. CORE eventually determined that Hughes was entitled to short-term disability benefits. *See* Pl.'s Add'l Facts ¶ 85. LINA convincingly argues, however, that Hughes' short-term disability claim "involves a different insurance carrier and the record contains no information concerning the terms or conditions of coverage under the short-term disability plan." Defendant's Reply to Plaintiff's State-

On January 7, 1998, after reviewing all the information then in the claim file, Hackett–Wade determined that Dr. van Cleeff had not declared Hughes disabled and, in the period following Hughes' last day of work, Dr. van Cleeff was the only doctor treating Hughes and treatment was only for a sinus infection and bronchitis. *See* R. at 000088. Hackett–Wade noted that Dr. van Cleeff "goes on to say that he does not know why Mr. Hughes would be off work, and he thinks the employee 'works when he feels like it.' " *Id.* Hackett–Wade further noted her initial difficulty in reaching a decision as to Hughes' claim since,

> [Hughes] did actually have some medical problems. Dr. Keener began treating the claimant in March for nephrotic syndrome,.... I questioned Jackie if it was possible that the claimant may have been exposed to chemicals as he is stating, and maybe Dr. VanCleef [sic] missed the diagnosis. She said it may be possible, but she would have to question if the nephrotic syndrome would even be disabling.

*Id.* at 000089. Despite her ambivalence, Hackett–Wade recommended that LINA deny Hughes' longterm disability claim due to a "lack of supportive medical evidence." *Id.* After reaching her conclusion, Hackett–Wade again forwarded the file to Smith for review.

Smith examined the file and notified Hughes by letter, dated January 8, 1998, that LINA was denying his claim for longterm disability benefits. *See* Mat. Facts ¶ 59. Smith informed Hughes that before LINA could determine that such benefits are warranted, "we must have medical evidence supporting a condition of total disability from your last day worked." R. at 000085. Smith inventoried the medical records in the LINA file that had been provided by Drs. van Cleeff, Keener, and Sinden, including Dr. van Cleeff's July 24, 1997, letter proposing to remove himself from the process of determining Hughes'

disability status as of January, 1997, and Dr. van Cleeff's statements to CORE that he did not certify Hughes disabled at any time prior to March, 1997. *See id.* at 000085–86. Smith summarized LINA's position on Hughes' claim:

> As previously stated, in order for [longterm disability] benefits to be considered, we must be able to establish a condition of total disability as of the date you ceased working. After a complete review of the evidence provided, we are unable to document a period of disability beginning on or about January 8, 1997.... [W]e are advising you that we have been unable to document total disability, as defined [in the policy], from your last day worked through the benefit waiting period. As a result, we must regretfully deny this claim for benefits.

R. at 000086. Smith further informed Hughes that LINA's decision could be reconsidered, but only if Hughes provided additional medical evidence supporting total disability dating back to January, 1997. Specifically, Hughes was directed to provide records that "outlin[e] how your condition in January progressed to the point of becoming totally disabling, ... Any medical information provided must cover the period January, 1997 through present and must support total disability from your occupation as defined above." *Id.* Finally, Smith advised Hughes of his right to appeal the decision. *See* Mat. Facts ¶ 60.

Thereafter, counsel for Hughes contacted LINA to initiate the appeal process, but he submitted only three additional items in support of Hughes' claim. *See id.* at ¶ 61. One item was Dr. Sinden's APS which LINA already had on file. Second was Dr. Keener's APS, also already on file, but including an additional APS, signed by Dr. Keener on June 3, 1997, in which Dr. Keener estimated that Hughes had been unable to work due to the illness from January 1, 1997, and would continue to be unable to work for an indefinite period

ment of Additional Material Facts ("Def.'s Reply to Pl.'s Add'l Facts") ¶ 85.

pending work-up. *See* R. at 000074; Pl.'s Resp. to Mat. Facts ¶ 56. Last, Hughes provided a letter from Dr. Keener, dated April 27, 1998, that stated:

> The patient at [the time Dr. Keener began treating Hughes in March, 1997,] had possibly eight to ten weeks of symptomatology with weakness, body swelling, etc. . . . The patient had this disease process begin developing after an exposure on his job at a chemical plant in Mexico. Since it appeared from the history and physical examination that the chemical exposure was highly likely as the culprit for the patient's problem, the *decision was made that the patient was disabled from his present occupation since it involved exposure to various types of chemical inhalants and the possibility of large scale exposure.* You are already in possession of a[n][APS] from me dated 6/3/97 stating that *his disability began approximately 1/1/97* . . . . To the best of my knowledge and with a review of my records, I see no reason to change this statement at this time.

R. at 000073 (emphasis added).

Hughes' appeal was considered by Rodney Stief ("Stief"), LINA Senior Case Manager, who examined anew the entire case file and determined that the denial of benefits should be upheld. *See* Mat. Facts. ¶ 69. On May 20, 1998, Stief wrote to counsel for Hughes reiterating that the claim had originally been denied due to a lack of medical evidence supporting his disability from his last day of work to the present. Stief noted that the documents sent in support of the appeal verified that Dr. Keener did not begin treating Hughes until March 27, 1997, but that the last day Hughes worked was January 7, 1997. Stief emphasized that Dr. van Cleeff was the only treating physician prior to March, 1997, and that Dr. van Cleeff had failed to submit any additional evidence to show

that Hughes was disabled. Although Dr. Keener's letter submitted in support of the appeal stated it was "most likely" that chemical exposure at work caused Hughes illness,[6] Stief commented that "[t]hat conclusion was never verified." R. at 00070. Further, Stief claimed that Dr. Keener had provided no records that indicated a chemical cause for Hughes' condition. *See id.*

Stief's denial of Hughes' claim was based on several factors: First, LINA claims that the file contained no medical information to establish a disability as of January, 1997; although Hughes was treated for nephrotic syndrome in March, 1997, Stief concluded that the file did not reflect the cause of that condition and its relationship to the earlier treatment for sinusitis and bronchitis. Second, the extent of Hughes' limitations as of January, 1997 was never clarified. Third, the records of Hughes' status post-hospitalization in July, 1997 demonstrated that he responded well to treatment; therefore, the records did not establish that Hughes was presently disabled. "Because the information on file does not establish disability from the claimant's last day worked to the present, we must advise you that the denial of this Long Term Disability claim was appropriate and is reaffirmed." Hughes was informed that LINA would review any additional information that he submitted in support of his claim. *See* R. at 000070.

On June 9, 1999, counsel for Hughes wrote to Stief contending that the claim had been improperly denied, demanding that benefits be provided, and threatening to bring suit. *See* Mat. Facts ¶ 75. On June 21, 1999, a LINA Case Manager wrote to Hughes' counsel advising him that the file had been forwarded to a Senior Case Manager for further review. Before such review could be completed, Hughes filed this suit in our court. *See* Mat. Facts ¶¶ 76–77.

---

**6.** Stief mis-quotes Dr. Keener as we have already shown the letter to say it was "highly likely" that such exposure was the cause.

*Compare* R. at 000073 *with* R. at 000070. This error does not affect the impact of his conclusions.

*Discussion*

### A. Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998).

With a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the nonmovant to "go beyond the pleadings" to cite evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 106 S.Ct. 2548. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in [his] favor on a material question, then the court must enter summary judgment against [him]." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505.

In considering a motion for summary judgment, a court must draw all reasonable inferences in a light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir. 1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). However, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but also required. *See Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989).

### B. Standard of review under ERISA Section 502(a)(1)(B)

■ Our resolution of the issues on summary judgment turns, in large part, on the level of deference we must grant LINA's decisions relating to Hughes' claim for long-term disability benefits under an ERISA policy. Analogizing to principles of trust law, for challenges under Section 502(a)(1)(B) the Supreme Court has made the default rule a plenary, de novo standard of review of a plan administrator's decision whether to award benefits under an ERISA plan. *See Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). However, we vary from this default rule if a plan confers the power on the administrator to exercise discretion and apply a deferential "arbitrary and capricious" standard of review. *Id.; Herzberger v. Standard Ins. Co.,* 205 F.3d 327, 331 (7th Cir. 2000); *Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan,* 144 F.3d 1014, 1019 (7th Cir.), *cert. denied,* 525 U.S. 947, 119 S.Ct. 372, 142 L.Ed.2d 307 (1998). The usual way in which a benefit plan grants such discretionary authority is through the language it uses to vest power in the plan administrator, though there are no mandatory "magic words" required to vest such authority, and a plan administrator's discretion may also be reasonably ascertained from the nature of the benefits, or the conditions the plan places upon receiving them. *See Herzberger,* 205 F.3d at 331; *Mers,* 144

F.3d at 1020; *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 379 (7th Cir.1994); *Sisters of the Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust*, 901 F.2d 1369, 1371 (7th Cir.1990).

In *Herzberger*, an opinion circulated to all of the judges on the Seventh Circuit prior to publication, the Court adopted the following "safe harbor" language for ERISA plans: "'Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them.'" *Id.* at 331. Inclusion of such language assures that a review of any benefits decisions would be under the deferential "arbitrary and capricious" standard. *Id.* Even if this exact language is not included in an ERISA plan, such discretion should be accorded so long as the plan "contain[s] language that . . . indicates with the requisite if minimum clarity that a discretionary determination is envisaged." *Id.*

In the case at bar, both parties agree that the policy at issue grants such discretion to LINA, as claim administrator, and that some form of the "arbitrary and capricious" standard therefore applies. *See* Def.'s Mem. at 13–15; Pl.'s Resp. at 11. A comparison between the policy's language and *Herzberger*'s "safe harbor" language clearly supports this conclusion. Under the terms of the policy, LINA is granted the "discretionary authority" to

> interpret and apply plan terms and to make factual determinations in connection with its review of claims under the plan . . . [including but not limited to] the determination of the eligibility of persons desiring to enroll in or claim benefits under the plan, the determination of whether a person is entitled to benefits under the plan . . . [and] the discretionary authority to perform a full and fair review, as required by [ERISA] of each claim denial which has been appealed by the claimant.

Mat. Facts ¶ 5. This language is even more explicit than the "safe harbor" terminology suggested by the Seventh Circuit, detailing as it does the elements of a claim-related decision and granting LINA the discretion to determine each of them. Clearly, this disability policy was written to grant LINA discretionary authority and any decisions made with respect to a claim must therefore be reviewed under the arbitrary and capricious standard.

The arbitrary and capricious standard is the "least demanding form of judicial review of administrative action." *Trombetta*, 102 F.3d at 1438. Utilizing this standard, we will reverse LINA's decision only if it is "completely," "clearly" or "downright" unreasonable. *See Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1147 (7th Cir. 1998); *Mers*, 144 F.3d at 1021; *Brehmer v. Inland Steel Indus. Pension Plan*, 114 F.3d 656, 660 (7th Cir.1997). We will not second-guess the correctness of LINA's decision if it "was made rationally and in good faith." *Brown v. Retirement Comm. of Briggs & Stratton Retirement Plan*, 797 F.2d 521, 529 (7th Cir.1986); *see also Mers*, 144 F.3d at 1021 (noting that the function of the court utilizing the arbitrary and capricious standard is not to decide whether it would reach the same decision as the plan administrator or even rely on the same authority).

Absent unusual circumstances, such as fraud or bad faith, a decision to deny benefits is not deemed arbitrary and capricious so long as it is possible to offer a reasonable explanation for that decision based on the evidence. *See Trombetta*, 102 F.3d at 1438; *see also Mers*, 144 F.3d at 1021 (stating that we are not to set aside a plan administrator's denial of benefits that is "based on a reasonable interpretation of the plan documents."). A decision is arbitrary and capricious "only when the decision maker 'has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence . . . , or is so implausible that it could not be ascribed to difference in view or the product of . . .

expertise.'" *Trombetta,* 102 F.3d at 1438 (alteration in original) (quoting *Pokratz v. Jones Dairy Farm,* 771 F.2d 206, 209 (7th Cir.1985) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983))). Stated otherwise, an arbitrary and capricious standard of review requires that we evaluate "the impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of outside experts where necessary and the soundness of the fiduciary's ratiocination." *Chalmers v. Quaker Oats Co.,* 61 F.3d 1340, 1344 (7th Cir.1995).

Before turning to an analysis of these factors, Seventh Circuit caselaw, which reflects an apparent split in authority, requires us to assess whether the factors stated by *Chalmers* are still relevant. In *Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan,* the Northern District of Illinois, applying the *Chalmers'* factors, held that a denial of short-term benefits was arbitrary and capricious. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan,* 979 F.Supp. 726, 729 (N.D.Ill. 1997), *vacated,* 195 F.3d 975 (7th Cir.1999). The plaintiff was seriously injured, physically and psychologically, in an automobile accident in 1988 incurring among other things migraine headaches and post-traumatic stress disorder. *See id.* at 727. Because of these injuries, plaintiff went on disability leave several times between 1988 and 1992; after she returned from her last leave of absence on September 1, 1992, she had no extended absences due to sickness or illness prior to her eventual departure in September of 1994. *See id.* Thereafter, plaintiff sought short-term disability benefits under the terms of an ERISA plan, a claim that was eventually denied. *See id.*

The district court applied the factors laid out in *Chalmers.* First, the court concluded that the benefits decision was clouded by a potential conflict of interest that cast doubt on its impartiality. *See id.* at 729–30. Moreover, the court noted that the person reviewing the claim had admitted that it "was one of the more complex items that he handled during his tenure" with the company and, despite its complexity, coupled with the decision-maker's lack of medical training and knowledge, and the recommendations of a nurse that plaintiff undergo independent medical evaluations, the denial was made without any outside medical consultation. *See id.* at 730. The court held that the "non-use of any outside expert assistance and the limited use of inside expert assistance weighs heavily against" the decision. *Id.* Finally, the court determined that the reasoning underlying the denial of benefits was not sound because the decision was premised on an issue that the court viewed as irrelevant—to wit, that nothing in the record showed a change of condition between 1992 and 1994 that would have forced the plaintiff to stop working. *See id.* at 730–31. The district court held that "[c]onsideration of the various factors reveals serious flaws in UNUM's decision-making process which rendered it arbitrary and capricious. By failing to seek outside expert assistance, working under a potential conflict of interest, and ignoring the nature, demands and responsibilities of the insured's job, UNUM overlooked important issues." *Id.* at 731. On this basis, the court remanded the claim to the plan administrator for further determinations consistent with the concerns highlighted by the court. *See id.*

On appeal, a divided panel of the Seventh Circuit reversed the district court's decision that the denial of benefits was arbitrary and capricious. *See Perlman,* 195 F.3d at 982. Without explicitly referencing the court's opinion in *Chalmers,* the appellate court disagreed with the lower court's opinion that there was a potential conflict of interest. The trial court, having determined that since the corporation charged with deciding the plaintiff's claim

was also responsible for the payment of any benefits deemed necessary, a conflict of interest existed, the Seventh Circuit held that there was a conflict of interest only if the corporation's agent who was charged with deciding the claim had an interest in the outcome. *See Perlman,* 195 F.3d at 981. On the basis of the evidence presented, the Seventh Circuit found no conflict of interest, and further ruled that it was improper for the district court, in applying the standard arbitrary and capricious standard of review, to have allowed any discovery to be conducted in the form of depositions and interrogatories into the thought processes of the decisionmaker and the training of those who passed on the claim. *See id.* Using broad language, the Seventh Circuit held that, absent a situation where "the application was thrown in the trash rather than evaluated on the merits . . . [,] when there can be no doubt that the application [for benefits] was given a genuine evaluation, judicial review is limited to the evidence that was submitted in support of the application for benefits, and the mental processes of the plan's administrator are not legitimate grounds of inquiry any more than they would be if the decisionmaker were an administrative agency." *Id.* at 982.

Turning then to the evidence presented in support of the claim, the Court of Appeals found that the plan administrator's focus on the lack of medical evidence supporting a "change of condition" was enough to entitle the administrator to deny the claim. *See id.* at 982–83. "A responsible administrator . . . was entitled to deny Perlman's claim, without obtaining additional medical evaluations, *for the simple reason* that Perlman never argued that she was less able to do the job at the end of 1994 (or in 1995) than in the middle of 1993." *Id.* at 983 (emphasis added).

Judge Wood, in a strong dissent, argued that the majority opinion had "effectively precluded as a matter of law any procedural challenge to an ERISA plan administrator's decisions, thereby giving those decisions a *uniquely privileged position* in the entire field of administrative or quasi-administrative law." *Id.* at 983 (Wood, J., dissenting) (emphasis added). Accepting the majority's reasoning that an ERISA plan administrator's decision is entitled to the same deference as a decision-maker at the Social Security Administration, Judge Wood nonetheless concluded that there was no justification for refusing to examine how that decision was made. *See id.* at 986. Judge Wood concluded that the plaintiff had "raised a serious challenge to the procedure UNUM followed after she submitted her 1994 claim for benefits," believing the defect was in not collecting any medical evidence to support its decision, but instead assuming that "the fact that Perlman had been working after her injuries meant that she was not disabled." *Id.* at 987. Thus, while the majority focused its inquiry on whether the plaintiff had presented any evidence to support her claim that her condition had worsened prior to her claim for benefits, Judge Wood focused on "whether UNUM correctly understood [Perlman's] abilities in relation to the demands of her job. . . ." *Id.* (alteration in original).

The majority opinion in *Perlman* could be read to suggest that, at least in the absence of a conflict of interest, a court applying the arbitrary and capricious standard of review can *never* examine the factors identified by *Chalmers,* namely "the complexity of the issues . . . , [and] the extent to which the decisionmakers utilized the assistance of experts where necessary." *Chalmers,* 61 F.3d at 1344 (citing *Exbom v. Central States Health & Welfare Fund,* 900 F.2d 1138, 1142 (7th Cir.1990).)[7]

---

7. The other two factors, "the process afforded the parties, . . . and the soundness of the fiduciary's ratiocination" would still appear to remain proper avenues of inquiry. The latter factor directs the court to determine whether the evidence presented to the decision-maker supports its decision, applying the proper level of deference to its findings, and is necessary to avoid the court's review from becoming a mere rubber-stamp. The former

We, however, are of the view that the *Perlman* majority opinion did not intend such a broad result. We come to that conclusion for the following reasons:

First, the Seventh Circuit in *Perlman* never explicitly confronted the potential conflict it had created with the factors identified in its *Chalmers* opinion, factors that have been cited with approval by numerous courts in our circuit, including the Seventh Circuit itself as recently as ten days prior to *Perlman*. *See Carr v. Gates Health Care Plan*, 195 F.3d 292, 295 (7th Cir.1999); *see also Cozzie v. Metropolitan Life Ins. Co.*, 140 F.3d 1104, 1109 (7th Cir.1998) (discussing the *Chalmers* factors and noting that some of them "are designed principally to train the judicial examination on the thoroughness with which the fiduciary has examined the factual underpinnings of the situation."); *Reagan v. First UNUM Life Ins. Co.*, 39 F.Supp.2d 1121, 1127 (C.D.Ill.1999) (weighing the *Chalmers* factors); *Gawrysh v. CNA Ins. Co.*, 8 F.Supp.2d 791, 795–96 (N.D.Ill.1998) (applying the *Chalmers* factors and finding the decision arbitrary and capricious due to the complexity of the disease involved and the lack of evidence that any person had medical training to qualify him or her to evaluate such information); *Hightshue v. AIG Life Ins. Co.*, 939 F.Supp. 1350, 1356 (S.D.Ind.1996), *aff'd*, 135 F.3d 1144 (7th Cir.1998); *cf. Woo v. Deluxe Corp.*, 144 F.3d 1157, 1161 (8th Cir.1998) (citing

*Hightshue* and finding that, in the face of a potential conflict of interest, the decision-maker had failed to use the proper judgment by not having a medical expert review a claim involving an uncommon disease and medical opinions supporting the plaintiff's disability claim, and that this procedural defect combined with the conflict of interest required the court to give less deference to the administrator's decision than is normally afforded under the arbitrary and capricious standard of review). If the *Perlman* panel intended to overturn such a solid line of precedent, we believe it would have said so explicitly.

Moreover, the Supreme Court's opinion in *Bruch*, the decision that established the standards to apply in ERISA cases under Section 502(a)(1)(B), cited a conflict of interest as one factor in determining whether the administrator's decision was arbitrary and capricious. *See Bruch*, 489 U.S. at 115, 109 S.Ct. 948. This position lends credence to the possibility that other, procedural defects—such as the failure to consult with a medical opinion when reviewing a claim involving a complex medical issue—are also appropriate bases for determining that an abuse of discretion has occurred.[8]

Finally, turning to the analysis employed by the Court in *Perlman*, the broad language barring judicial inquiry into the thought processes and training of those who considered the claim follows its hold-

factor also would retain vitality, although would seem to be limited to determining whether the claim was actually reviewed or whether it was "thrown in the trash" or some other, equally egregious, gross abuse of the decision-maker's duties.

8. The Supreme Court in *Bruch* cites the Restatement (Second) of Torts § 187, Comment d (1959) to support its position vis-a-vis a conflict of interest. *See Bruch*, 489 U.S. at 115, 109 S.Ct. 948. The Restatement provides that the court can control a trustee if "he acts beyond the bounds of reasonable judgment." *See* Restatement (Second) of Trusts § 187, Comment i (1959). It is reasonable to say that one way in which a trustee, and by analogy a plan's administrator, can

act "beyond the bounds of reasonable judgment" is to make a decision on an issue that clearly requires a level of specialized knowledge which the plan's administrator plainly lacks. Such an approach is supported by the *Chalmers* factors, which allow the court to inquire into common ways by which a plan's administrator might act beyond the bounds of reasonable judgment: by making a decision based on its own self interest rather than on the evidence presented to it, by failing to engage in any of the procedural requirements imposed by the delegation of authority before making its decision, by making a decision that a reasonable person would understand to be plainly beyond the scope of its knowledge, and by making a decision that is not reasonably supported by the evidence.

ing that the district court is limited to the information reviewed by the administrator. *See id.* at 981. The circumscribing of judicial review under the arbitrary and capricious standard addresses the district court's violation of this principle when it allowed additional discovery and then relied on the newly developed material.

The majority opinion in *Perlman* concludes by stating that in the case before it "[a] responsible administrator ... was entitled to deny Pelman's claim without obtaining additional medical evaluations, for the simple reason that Perlman never argued that she was less able to do the job at the end of 1994 (or in 1995) than in the middle of 1993." *Id.* at 983. It is clear that the Court did not hold that such consultation is *never* required, only that on the facts of that case it was unnecessary to the decisionmaker's reasonable interpretation of the evidence. This seems to be the point at which the majority and dissenting opinions diverge. The factual issue, according to the majority view, which confronted the plan's administrator was *not* one requiring any specialized knowledge or expert medical opinion to permit a full understanding of the plaintiff's limitations.

Thus, applying the *Chalmers'* factors, the majority of the *Perlman* Court found no conflict of interest, determined that the issue presented was not complex, that the process was sufficient, that no outside expertise was necessary, and that the administrator's decision had a rational relationship to the evidence. In contrast, Judge Wood perceived the issue to be whether the plan's administrator properly understood the plaintiff's abilities in relation to the demands of her job, a determination Judge Wood considered beyond the expertise of the decision-maker.

We conclude that, despite the confusions created by *Perlman*, Seventh Circuit law requires that in deciding whether the

plan's administrator's decision was arbitrary and capricious, the court is to evaluate "the impartiality of the decisionmaking body, the complexity of the issues, the process afforded the parties, the extent to which the decisionmakers utilized the assistance of outside experts where necessary and the soundness of the fiduciary's ratiocination." We now address those factors seriatim.

### 1. The impartiality of the decision-making body

■ Was the plan administrator operating under a conflict of interest at the time of its decision? *Cf. Chalmers,* 61 F.3d at 1344; *see also Bruch,* 489 U.S. at 115, 109 S.Ct. 948; *Mers,* 144 F.3d at 1020; *Donato,* 19 F.3d at 380 n. 3. That issue cannot be resolved simply on the basis of whether the plan administrator was also the insurer. *See Donato,* 19 F.3d at 380 n. 3. We assume that a fiduciary has acted in a neutral manner unless the claimant can show through specific evidence of "actual bias" that there was a significant conflict. *See Mers,* 144 F.3d at 1020; *Van Boxel v. Journal Co. Employees' Pension Trust,* 836 F.2d 1048, 1051, 1053 (7th Cir.1987).

More than a financial stake in the outcome of a claim for benefits is necessary to establish a conflict of interest serious enough to impact our analysis. *See Perlman,* 195 F.3d at 981; *Carr,* 195 F.3d at 296; *Mers,* 144 F.3d at 1020–21; *Van Boxel,* 836 F.2d at 1051. The award of benefits in a single case often has only a trivial effect on the financial interests of a large corporation. *See, e.g., Perlman,* 195 F.3d at 981; *Van Boxel,* 836 F.2d at 1051. In contrast, a conflict may be found to exist, thus warranting less deference, if the first-level decision-maker had a direct or personal self-interest in the outcome. *See Perlman,* 195 F.3d at 981; *Gallo v. Amoco Corp.,* 102 F.3d 918, 921 (7th Cir.1996); *Van Boxel,* 836 F.2d at 1052.[9]

---

9. Some case authority discusses this issue as a "heightened" arbitrary and capricious review, while others discuss it in terms of a factor to consider in the standard arbitrary and capricious review. *Compare Mers,* 144 F.3d at 1020 & n. 1 (discussing conflict of interest in terms of a heightened standard of review); *Van Boxel,* 836 F.2d at 1049–52

The only "evidence" cited by Hughes to support his claim that a conflict of interest occurred in this case is LINA's joint status as insurer and plan administrator. Hughes fails to provide any specific evidence of an "actual bias" in LINA's consideration of his claim. Nowhere does he contend or prove that the decision-makers in his case—Hackett-Wade, Smith, and Stief—had any self-interest in the outcome of his claim for benefits. The *Perlman* holding makes it clear that, absent such specific evidence, Hughes has failed to raise an issue of material fact that a conflict of interest existed, without which there is no basis for us to depart from the presumption that the plan administrator acted in a neutral fashion in reviewing and denying his claim. *See Perlman,* 195 F.3d at 981.

2. *The complexity of the issues confronted by LINA, the process afforded Hughes and the utilization of outside experts*

■ We combine our analysis of these factors in recognition of the fact that they are inextricably linked together in this case. *Cf. Central States, Southeast and Southwest Areas Pension Fund v. Gateway Foods of Twin Ports, Inc.,* 951 F.Supp. 732, 737 (N.D.Ill.1996) (discussing impartiality, complexity, and the process afforded Gateway before "delving into the substance" of the decision). Viewed even cursorily, we can easily determine that the process afforded Hughes was more than sufficient. LINA allowed him to provide all of the medical records relevant to his treatment, and, in fact, LINA supplemented the documents which Hughes provided by seeking the records generated by CORE, the company that reviewed Hughes short-term disability claim, and the company that reviewed his workers compensation claim. Moreover, after initially rejecting Hughes' claim, LINA provided him with the opportunity for reconsideration by them if he could supplement those materials already in its possession. Even so, due to the complexity of the illness suffered by Hughes, we are of the opinion that LINA's process was not sufficient in that it failed to engage any medical expert whose knowledge about the disorder could have informed the administrator's decision-making.

The record before LINA establishes without controversy that the condition from which Hughes suffered was a complicated one. Dr. van Cleeff, Hughes' initial treating physician, informed LINA that Hughes was suffering from a "series of difficult and evolving medical problems" involving a "complexity of [ ] issues...." R. at 000241. For this reason, Dr. van Cleeff sought to "remov[e]" himself from the process of determining Hughes' disability status and referred both CORE and LINA to Dr. Keener for an opinion regarding Hughes' status prior to June 23, 1997, the date of his hospitalization. Moreover, both Drs. Keener and Sinden indicated that they believed that Hughes was suffering from a single illness as far back as January of 1997, even though the diagnosis of nephrotic syndrome was not made until March of 1997. We are not able to say that this evidence required LINA to grant Hughes' claim for long-term disability benefits, but it clearly creates an issue of material fact over whether a reasonable decision-maker under these circumstances was required to obtain specialized medical evaluations.

The complexity of the medical issues and the difficulties of diagnosis experienced by Hughes' treating physicians should have signaled Hackett–Wade and her superiors, Smith and Stief, that some independent

(same), *with Bruch,* 489 U.S. at 115, 109 S.Ct. 948 (discussing a conflict of interest as a factor to consider in applying the standard arbitrary and capricious review); *Perlman,* 195 F.3d at 981 (same); *Hightshue,* 135 F.3d at 1148 (same); *Donato,* 19 F.3d at 380 n. 3

(same). Regardless of the characterization, however, the fundamental issue remains whether the claimant has provided specific evidence of "actual bias" to establish an actual conflict of interest.

medical assessment of Hughes' condition was necessary before they could make their decision, especially a decision that would at least in part discount or contradict the opinions of Hughes' treating doctors, Dr. Keener and Dr. Sinden. LINA asks in this motion for summary judgment that we find its decision to deny Hughes' claim not arbitrary and capricious; however, LINA's failure to involve such a consultation, in the face of the obvious medical complexity, made its decision less authoritative, less reliable, and precludes us from reaching such a conclusion. *See Woo,* 144 F.3d at 1161 (finding the evidence insufficient to uphold administrator's denial of benefit, holding that the decision-maker failed to use proper judgment and that such a procedural defect required less deference to the administrator's decision where it neglected to have a medical expert review the evidence in the face of an uncommon disease and reports from the treating doctors that the plaintiff was disabled); *Gawrysh,* 8 F.Supp.2d at 795–96 (finding decision arbitrary and capricious where the issue before the decision-maker was complex and there was no evidence that the person responsible for making the decision had any medical training or knowledge necessary to evaluate such a complex issue); *Maida v. Life Ins. Co. of North America,* 949 F.Supp. 1087, 1092–93 (S.D.N.Y.1997) (holding that denial of benefits on mental disability claim was "a paradigm of arbitrary and capricious action" where the benefits analyst did not have a medical background that would have allowed him to evaluate plaintiff's medical diagnosis, he was presented with some evidence that supported claim for benefits, and rejected that evidence without consulting a qualified medical professional); *see also Hightshue,* 135 F.3d at 1148 (holding that, in the face of a potential conflict of interest, the decision-maker was not arbitrary and capricious in denying benefits since its decision was made in reliance on the opinion of an outside expert with sufficient expertise and experience who had been provided complete and accurate medical records); *Donato,* 19 F.3d at 380 (concluding that a denial of benefits was not unreasonable where the decision-maker had relied on the position of an independent medical consultant); *Reagan,* 39 F.Supp.2d at 1127–28 (weighing all of the *Chalmers'* listed factors and finding that a denial of benefits was not arbitrary and capricious where it was based on the recommendation of an in-house cardiologist who had reviewed the medical records); *Dew v. Wickes Lumber Co.,* NO. 95–C–355, 1996 WL 559962, at *4 (N.D.Ill. Sept. 30, 1996) (holding that denial of benefits was not arbitrary and capricious where the decisionmaker relied on the opinion of an independent medical consulting agency in the face of a conflict of interest); *Ramos v. Metropolitan Life Ins. Co.,* No. 3:94–CV–382RP, 1995 WL 46715, at *4 (N.D.Ind. Jan. 24, 1995) (finding that defendant had not acted in an arbitrary and capricious manner and its denial of benefits was reasonable, where it relied on an independent medical consultant's opinion); *but see Rowell v. Life Ins. Co. of North America,* No. 96–C–8076, 1998 WL 708805, at *6 (N.D.Ill. Sept. 30, 1998) (finding the failure to conduct an independent review of the plaintiff's claim "troubling" but not dispositive given that the first opinion offered in support of plaintiff's disability was not made until eighteen months after he was terminated).

To be clear, we are not by this decision suggesting that LINA must engage an independent third party medical assessment of all disability claims presented for its review; existing medical records submitted by the claimant may suffice or the use of an in-house medical expert may provide the decisionmaker with the expertise necessary to evaluate complicated medical problems. *See, e.g., Reagan,* 39 F.Supp.2d at 1127. What we do require, as a result of this ruling, is that when faced with a complicated medical process, such as where a patient's doctor states his opinion that the patient is suffering from a progressive disorder like nephrotic syn-

drome in the absence of another credible medical opinion that such diagnosis is incorrect, a plan administrator must secure at the very least some further medical review prior to disregarding the doctor's diagnosis. The record in this case makes it clear that Hughes' claim presented such a situation to LINA.

To support Hughes' claim that he was suffering from a single disabling disorder dating back to January of 1997, Hughes relied upon the records of Drs. Keener, Becherer and Sinden. Dr. Keener opined that Hughes' illness extended back before the date he first saw him on March 27, 1997, to the beginning of January, 1997. LINA had in its possession an APS filled out by Dr. Keener on June 3, 1997 that indicated that Hughes' illness rendered him unable to work as of January 1, 1997. *See* R. at 000074. Moreover, Dr. Keener wrote a letter dated April 27, 1998 stating that, at the time of his first encounter with Hughes, Hughes presented with "possibly eight to ten weeks of symptomatology . . . [a] disease process [that] beg[a]n developing after an exposure on his job at a chemical plant in Mexico." R. at 000073. Dr. Keener reiterated in this letter that according to his best judgment, the disability began approximately January 1, 1997. *See id.* In addition, at LINA's request,

Dr. Sinden, the cardiologist who treated Hughes following his hospitalization on June 23, 1997, also submitted an APS, dated October 16, 1997, in which the date that Hughes was first unable to work was referenced as January of 1997. *See* R. at 000501–02.

In contrast, LINA points only to the records of Dr. van Cleeff.[10] Dr. van Cleeff informed CORE that he did not treat Hughes for his "disability" until March of 1997, when Hughes presented with edema, lending support to the possibility that the symptoms suffered previously were unrelated to Hughes' subsequent nephrotic syndrome. Moreover, Dr. van Cleeff stated to a CORE representative that he thought Hughes "worked when he feels like it." However, Dr. van Cleef's later statement that he was removing himself from the disability determinations due to their complexity, renders unreliable some of his opinions on Hughes condition, at least insofar as they might contradict the medical opinions of the specialists Drs. Keener and Sinden, the doctors to whom Dr. van Cleeff directed LINA for determinations as to Hughes' disability. In fact, Hackett–Wade stated herself that Dr. van Cleeff may have "missed the diagnosis." R. at 000089.[11]

---

**10.** It is true that Dr. Becherer, an infectious specialist who treated Hughes in April of 1997 at the request of Dr. Keener, recorded in his notes that, while Hughes associated the edema with his symptoms of January, 1997, Dr. Becherer did not "have a way of tying those two processes together." R. at 000143. However, this isolated comment does little to support the position that Hughes suffered from multiple disorders that manifested themselves at different times; rather, it indicates Dr. Becherer's belief that his examination could not verify that Hughes' view was correct. Certainly, in the absence of any attempts by LINA to obtain further clarification from Dr. Becherer—for example, by sending him an APS to return—his notes only further support the proposition that Hughes' condition was a complicated one which required LINA to consult with someone with medical knowledge.

**11.** The memorandum that includes this comment goes on to say that she mentioned this

concern to "Jackie," a person whose role in this process remains unidentified, and "Jackie" responded that "she would have to question if the nephrotic syndrome would even be disabling." LINA can not go far by arguing that it relied on "Jackie's" opinion to deny Hughes claim. On the one hand, "Jackie's" role is not identified anywhere in the record; in fact, this is the only mention of "Jackie" discernable in the record. It is certainly not clear that "Jackie" was any more medically qualified than Hackett–Wade, Smith, or Stief to evaluate Hughes' condition. Moreover, even if "Jackie" is a medical professional, her opinion appears to be based solely on Hackett–Wade's oral description of the situation to her. There is no indication that she was ever provided the "complete and accurate" record of the claim as required to furnish a proper medical opinion. *See Hightshue,* 135 F.3d at 1148.

Hughes contends that the record generated by LINA establishes that "LINA did not understand the nature and extent of Hughes' illness, which lack of understanding resulted in LINA's failure to consider important aspects of the problem and LINA's misinterpretation of key doctors' opinions." Pl.'s Resp. at 12. We agree that the record before LINA creates an issue of material fact pertaining to whether it fully comprehended the complexity of the illness from which, according to Drs. van Cleeff, Keener, and Sinden, Hughes suffered.

### 3. LINA's reasoning for denying Hughes' claim

Hughes further contends that LINA's refusal to grant any weight to Dr. Keener's opinion that Hughes' illness caused him to be disabled as early as January 1, 1997, an opinion first stated in June of 1997 based upon Dr. Keener's treatment of Hughes which commenced on March 28, 1997, constitutes an "entire[ ] fail[ure] to consider an important aspect of the problem," *Trombetta*, 102 F.3d at 1438. *See* Pl.'s Resp. at 13; R. at 000074. LINA counters, saying that the file contains no medical information to establish a connection between Hughes' nephrotic syndrome and his earlier sinusitis and bronchitis, that the extent of Hughes' limitations as of January of 1997 was never clarified, and that the records show that Hughes responded well to the treatment he received while hospitalized from June 23, 1997, to July 1, 1997, thus negating Hughes' disabled status post-hospitalization. *See* R. at 000070. Addressing these arguments in turn, we agree with Hughes that LINA's

position is not a reasonable interpretation of the record.

As discussed above, the only competent medical evidence LINA had available to it were Drs. Keener's and Sinden's opinions that the condition for which they were treating Hughes was connected to the symptoms he presented to Dr. van Cleeff which extended back to January 1, 1997. We need not rehash this evidence; we simply say again that LINA's rejection of this uncontradicted medical evidence was not reasonable.[12]

Turning to LINA's contention that the extent of Hughes' limitations as of January of 1997 was never clarified, we again find their reasoning to be unsound. Looking at the evidence supporting Hughes' position, Dr. Keener wrote CORE that "from the history and physical examination ... the chemical exposure was highly likely as the culprit for the patient's problem, [and] the decision was made that the patient was disabled from his present occupation since it involved exposure to various types of chemical inhalants and the possibility of large scale exposure." Further, in a conversation with a CORE physician, Dr. Keener stated that he felt "strongly that for the entire period from 1/1[/97] to 6/3[/97 Hughes] should not have left the country, and should not have been exposed to toxins ... [and that the possibility of toxic exposure] precluded any risk at all." R. at 000102. Dr. Keener reiterated this position to LINA in the letter provided in support of Hughes' appeal. *See* R. at 000073. Thus, Dr. Keener's position was that Hughes' condition from January of 1997 through June of 1997 should have precluded him from any exposure to toxins and from any foreign travel.[13]

12. Dr. van Cleeff's comments made to CORE during its review of Hughes' short-term disability benefits claim are not sufficient to contradict Drs. Keener's and Sinden's diagnoses. *See* Mat. Facts ¶¶ 33, 35. As LINA persuasively argues, "the record contains no information concerning the terms of coverage under the short-term disability plan." Def.'s Reply to Pl.'s Add'l Facts ¶ 85. It would be unreasonable to rely on Dr. van Cleeff's state-

ments to dispose of Hughes' long-term disability claim without making any attempt to ascertain their context, a step LINA appears not to have made.

13. The fact that neither Dr. Keener nor Dr. Becherer ever specifically discussed with Hughes whether he was, or should be, working does not detract from Dr. Keener's conclusion. LINA emphasizes the absence of

Hughes' occupation required him to go to plant explosion sites and aid in the clean-up. *See* R. at 000144 (notes of Dr. Becherer). A job description generated by Fluor during LINA's review of Hughes' claim lists his position as "Safety Manager—Cactus 1 Rebuild from fire/explosion." R. at 000431. Hughes' position was described as requiring exposure to hazards, gases, dusts, "some" fumes, and mists. *See* R. at 000433. In addition, a job description created on December 18, 1995, indicated that a safety manager was required to administer programs on-site, as well as manage employees working in the safety department, presumably on-site. *See* R. at 000507.

Under the terms of the disability policy, an employee is disabled if "because of his ... Sickness he is unable to perform all the material duties of his regular occupation; ...." Mat. Facts ¶ 4. Comparing Fluor's job descriptions with Dr. Keener's medical opinion regarding the types of activities to which Hughes' condition precluded exposure, there is an indisputable overlap. Drawing reasonable inferences in Hughes' favor, as we must on summary judgment, a highly reasonable interpretation of Dr. Keener's notes and statements to LINA is that he felt Hughes unable to perform the material duties of his occupation as Safety Manager.

Thus, the only proper way in which Dr. Keener's medical opinion could be disregarded is if it was contradicted in some fashion by another medical opinion, a possibility we have already discounted, or if it was insufficient in some way (for example, that Dr. Keener was unable to provide such an opinion as to Hughes' limitations, or his opinion failed to adequately detail Hughes' limitations in a manner that indicated Hughes was disabled). *Cf. Bunnell v. Sullivan,* 912 F.2d 1149, 1153 (1990), *superceded in part on other grounds,* 947

F.2d 341, 348 (9th Cir.1991) (holding, in the context of a social security benefits denial, that a doctor's medical opinion may be discounted when it is largely conclusory or not based on clinical findings); *Marchetti v. Sun Life Assurance Co. of Canada,* 30 F.Supp.2d 1001, 1009 (M.D.Tenn. 1998) (holding that under arbitrary and capricious standard of review, an uncontradicted treating doctor's opinion may be rejected only for "clear and convincing reasons").

Dealing first with whether Dr. Keener was able to provide an opinion of Hughes' limitations as of January 8, 1997, LINA strongly contends that the only doctor who could make such a diagnosis was Dr. van Cleeff since Dr. Keener's diagnosis was rendered *"post hoc ...* months after [Hughes] stopped working." Defendant's Reply in Support of Motion to Strike Affidavit of J. Keith Keener, M.D., and Motion for Summary Judgment ("Def.'s Reply") at 4. While it is true that Dr. Keener did not begin treating Hughes until March 27, 1997, this fact alone does not render his diagnosis unfounded or irrelevant to Hughes' claim.

In *Maida,* the plaintiff's claim of mental disability "appeared to be an afterthought," having not been raised until eight months after plaintiff originally sought benefits. *See Maida,* 949 F.Supp. at 1092. The plan's administrator summarily dismissed this claim "focus[ing] on the belated addition of the conclusion of total disability contained in the second letter, the infrequency of treatment, and [the doctor's] report that Mr. Maida's 'speech was logical and coherent.'" *Id.* The Southern District of New York found the rejection of this claim to be a "paradigm of arbitrary and capricious action." *Id.* at 1093. In contrast, in *Rowell,* although the district court felt that a post-hoc disability diagnosis was sufficient to reject the plain-

---

such discussion, an issue LINA never raised with Dr. Keener (and about which it never even contacted Dr. Becherer). The absence of any specific opinion on whether Hughes

was able to work must be looked at in the context of Dr. Keener's ultimate conclusions, reached after finalizing Hughes' clinical examinations.

tiff's claim, that diagnosis was not made until eighteen months after the disability's alleged onset. *See Rowell,* 1998 WL 708805, at *6.

In contrast to the medical opinion in *Rowell* which was provided eighteen months after the disability's alleged onset, Dr. Keener's disability determination was made within several months. Although we do not express an opinion on how much weight such an opinion should be given, it is clear that it is entitled to some deference. LINA, instead, summarily dismissed Dr. Keener's ability to provide a diagnosis that preceded the date he began treating Hughes and refused to consider Dr. Keener's opinion in deciding whether Hughes was disabled as of January 8, 1997. This decision appears entirely unreasonable, especially in light of Dr. van Cleeff's indication to LINA that Dr. Keener was the appropriate person to provide a disability determination from January 1, 1997, through June of 1997.

Since LINA should have considered Dr. Keener's opinion and did not, we will not consider whether his opinion concerning the extent of Hughes' limitations is sufficient to support a claim of disability. The determination of the onset of disability is a factual determination and as such should be left to the plan's administrator, at least where the administrator has been granted the discretion to make such determinations. *See Ghazi v. Fiserv, Inc.,* 957 F.Supp. 167, 168–69 (N.D.Ill.1997). Since LINA did not consider this evidence in reaching its conclusion that the record did not support that Hughes was disabled as of January 7, 1997, its conclusion to that effect is clearly unreasonable.

Finally, we address LINA's last basis in support of its denial of Hughes' claim, to wit, that the records do not show that Hughes was disabled post-hospitalization, or after July 1, 1997. This conclusion is a "downright unreasonable" interpretation of the evidence. In LINA's reply brief in support of its summary judgment motion, it concedes that "[u]ndoubtedly, when

Hughes was hospitalized in June for cardiac problems, *and for some period thereafter,* he was disabled from work." Def.'s Reply at 7 (emphasis added). It is undisputed that Hughes was hospitalized from June 23, 1997, through July 1, 1997. *See* R. at 000251. Further, Dr. Sinden, who treated Hughes from June 23, 1997, through October 23, 1997, provided LINA with an APS, dated October 16, 1997, that notes Hughes' being incapable of performing his occupation, and a "Physical Capabilities" form, dated November 17, 1997, stating Dr. Sinden's medical opinion that Hughes should not work where he was not protected from weather, or exposed to extreme heat or cold, humidity, gases, fumes, or mists. *See* R. at 000251, 259.1–60, 502. Nowhere in the record does there appear a medical opinion contesting or contradicting Dr. Sinden's stated medical opinions, nor is there "clear and convincing evidence" sufficient to allow LINA to disregard Dr. Sinden's conclusions.

Again, drawing all reasonable inferences in favor of Hughes, as we must in deciding LINA's motion, the record simply does not reasonably support the view that Hughes' status changed to such an extent that he was *no longer disabled following his hospitalization.* To the contrary, it appears that Hughes was disabled from sometime beginning in early January of 1997 through at least the beginning of July of 1997. LINA's reasoning for disregarding Dr. Keener's medical opinion and its resultant denial of Hughes' claim render us unable to conclude that LINA's decision to withhold long-term disability benefits was not arbitrary and capricious.

### Conclusion

After reviewing the record and drawing all reasonable inferences in favor of Hughes and according appropriate deference to LINA's denial of Hughes' claim, we conclude that LINA's motion for summary judgment must be *DENIED.*

It is so ORDERED.

## ORDER

We hereby *VACATE* the September 6, 2000, trial date and *ORDER* the parties to show cause within fifteen (15) days why this case should not be remanded for reconsideration by Life Insurance Company of North America ("LINA") in light of the Court's entry of this date. If LINA declines to reconsider Plaintiff's claim for long-term disability benefits, LINA is ordered to show cause why summary judgment should not enter in Plaintiff's favor.

It is so ORDERED.